No. 61,468

JESSICA LOUISE BACON, a minor, and CHARLES BACON and CRISTINE BACON, individually and as her next friend, *Appellants*, v. MERCY HOSPITAL OF FT. SCOTT, KANSAS, a/k/a MERCY HOSPITALS OF KANSAS, INC., THOMAS PIROTTE, M.D., and COLETTE FLEMING, M.D., *Appellees*.

(756 P.2d 416)

Opinion filed June 3, 1988.

*Brock R. Snyder,* of Law Office of Brock R. Snyder, of Topeka, argued the cause and *Brian Frost,* of the same firm, was with him on the brief for appellants.

*Bill Wachter,* of Wilbert and Towner, P.A., of Pittsburg, argued the cause and was on the brief for appellees Pirotte and Fleming.

*Cynthia J. Schriock,* of Fisher, Heck & Cavanaugh, P.A., of Topeka, argued the cause and was on the brief for appellees Mercy Hospitals.

*Jeffrey W. Jones,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause and *Myron L. Listrom,* of the same firm, was with him on the brief for intervenor Fletcher Bell, Insurance Commissioner of the State of Kansas.

The opinion of the court was delivered by

HERD, J.: This is a medical malpractice action brought by Jessica Bacon, a minor, and Charles and Cristine Bacon, her parents, against Mercy Hospital of Ft. Scott, Dr. Thomas Pirotte, and Dr. Colette Fleming. A claim against Dr. Gary Grimaldi was dismissed and an action against Newman-Young Clinic under the doctrine of respondeat superior was settled and dismissed with prejudice. The Bacons appeal from the trial court's order granting summary judgment to defendants.

The facts reveal that in 1980 Cristine Bacon was in her second pregnancy. It was uneventful until the last minutes before delivery. Mrs. Bacon's doctor was Dr. Thomas Pirotte, a family practitioner with the Newman-Young Clinic, P.A. On November 11, 1980, Dr. Pirotte informed Mrs. Bacon there were no problems with her pregnancy and the child could be born at any time. Mrs. Bacon went into labor that night. She was taken to the labor room shortly after she was admitted to Mercy Hospital of Ft. Scott. Labor proceeded normally until 3:50 a.m. At that time, the fetal heart monitor began to register sudden, severe bradycardia, a slowing of the heartbeat. From 3:50 a.m. to 4:05 a.m. the monitor gave no tracing in which a discernible pattern could be read, probably because of the movement of the baby's heart away from the Doppler aim of ultrasound. It was later found the umbilical cord had wrapped around the baby's neck twice. The cord compression, which caused an autonomic nervous system mediated deceleration, probably accounted for the bradycardia.

The bradycardia was promptly recognized and Dr. Pirotte was called in a timely fashion. Dr. Pirotte appropriately ruptured the membranes and correctly connected an internal monitor so that at 4:05 the heart pattern could again be correctly ascertained. He moved the patient to the delivery room and called Dr. Grimaldi, an obstetrician. The baby, Jessica Bacon, was delivered at 4:25 a.m., by Dr. Grimaldi. She was not breathing, was markedly cyanotic, and had a heartbeat of less than 100 beats per minute.

Dr. Grimaldi suctioned the baby, clamped and cut the umbilical cord, and brought her to Dr. Pirotte, who immediately placed her on a warming pan, passed a laryngoscope through her mouth, inserted an endotracheal tube, and put a ventilating bag on the

tube in preparation for resuscitation efforts. The Bacons agree that all care provided by the appellees was reasonable up to that point, except the Bacons' witness, Dr. Wood, a pediatrician, testified a pediatrician should have been called at the same time as Dr. Grimaldi, the obstetrician.

Dr. Pirotte found severe bronchial and lung tissue resistance to his attempts to give the baby air from the bag. Dr. Pirotte testified this was not because the bag was defective, but because of the extraordinary resistance of Jessica's lungs. He had no explanation for why the resistance was so strong, but said that, although rare, it had been known to happen before. He immediately and appropriately switched procedures to the mouth-to-tube method, in which he put his mouth to the endotracheal tube fitting and breathed through the tube for the baby. An assistant held an oxygen tube near his mouth so that as he took a breath, his oxygen intake was enriched and transferred to Jessica. A staff member administered cardiac massage to Jessica at the same time. Between breaths, Dr. Pirotte asked that Dr. Fleming, a pediatrician, be called in.

Although she was not on call, Dr. Fleming arrived at 4:40 a.m., 15 minutes after Jessica's birth. At this point there is conflict in the testimony. Dr. Pirotte testified Jessica began to breathe on her own after about ten minutes, and resuscitation efforts ceased as her heartbeat and color improved. Dr. Fleming testified Jessica was taking some "gasping respirations" when she arrived, but she had been put back on the ventilating bag. When she took over the "bagging," she noted extreme lung resistance, but was able to continue resuscitation with the bag. She continued bagging for about fifteen minutes. She explained bagging must continue even after a baby begins to breathe spontaneously, until it is certain the danger is over. The endotracheal tube was not removed until 5:45 a.m., so the bag could quickly be reattached if necessary.

Dr. Fleming transferred Jessica, still in the warming tray, to the nursery after the respiratory emergency was over. Jessica's first recorded temperature was only 94 degrees. Dr. Fleming's notes say Jessica "was difficult to warm (temporary difficulty with machine)." Dr. Fleming testified, however, that she found no defects in the machine and continued to use it later. She said

the note was made to herself in order to check why Jessica was slow to warm. She and Dr. Pirotte, a big man, later concluded the initial difficulty had been caused by Dr. Pirotte's body blocking some of the rays in his successful efforts to resuscitate Jessica. Both testified such blockage could be difficult to prevent in that resuscitation was of first priority. Dr. Fleming added a light to Jessica's side to increase the temperature when she arrived. She recorded that Jessica had become pink with regular spontaneous respiration at one-half to three-fourths hours of age. By the age of two hours, Jessica's temperature had reached 97 degrees.

The evidence indicates Jessica was suffering hypoxia or even asphyxia for at least 20 to 35 minutes before birth. The Bacons attribute no fault to this period of deprivation. After birth, Jessica suffered asphyxia or hypoxia for a period of 25-30 minutes, perhaps as much as 45 minutes. It is this post-birth period of deprivation, as a result of appellees' alleged negligence, the Bacons claim caused Jessica's cerebral palsy. The cause of Jessica's cerebral palsy is the main issue in the case.

The first issue on appeal is whether the Bacons submitted sufficient evidence regarding causation to avoid summary judgment. Although the question of whether a defendant's actions proximately caused a plaintiff's injury is normally a question of fact for the jury, where the facts of a case are susceptible to only one conclusion, the question is one of law and may be properly subject to summary judgment. *Baker v. City of Garden City,* 240 Kan. 554, 557, 731 P.2d 278 (1987). Summary judgment is governed by K.S.A. 1987 Supp. 60-256, which provides in pertinent part:

"(c) . . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Lessley v. Hardage,* 240 Kan. 72, 73-74,

727 P.2d 440 (1986). The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. *Willard v. City of Kansas City,* 235 Kan. 655, Syl. ¶ 2, 681 P.2d 1067 (1984); *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, Syl. ¶ 5, 661 P.2d 348 (1983). If factual issues do exist, they must be material to the case to preclude summary judgment. *Busch v. City of Augusta,* 9 Kan. App. 2d 119, 123, 674 P.2d 1054 (1983).

Summary judgment is seldom proper in negligence cases. *Phillips v. Carson,* 240 Kan. 462, 472, 731 P.2d 820 (1987). On the other hand, the appellees do not, in order to prevail in their summary judgment motions, need to prove they were not negligent or that their actions did not cause Jessica's cerebral palsy. In *Celotex Corp. v. Catrett,* 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), the United States Supreme Court analyzed Rule 56(c) of the Federal Rules of Civil Procedure, which language is adopted verbatim in K.S.A. 1987 Supp. 60-256(c). The United States Supreme Court held there can be no genuine issue as to any material fact when the plaintiffs offer no proof concerning an essential element of their case. The Court stated:

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses and we think it should be interpreted in a way that allows it to accomplish this purpose." 477 U.S. at 323-24.

Negligence is never presumed, and may not be inferred merely from a lack of success or an adverse result from treatment. *Tatro v. Lueken,* 212 Kan. 606, 611, 512 P.2d 529 (1973). The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury. See *Funke v. Fieldman,* 212 Kan. 524, 535, 512 P.2d 539 (1973). Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation. *Webb v. Lungstrum,* 223 Kan. 487, 490, 575 P.2d 22 (1978); *Karrigan v. Nazareth Convent & Academy, Inc.,* 212 Kan. 44, 48-51, 510 P.2d 190 (1973). Expert witnesses must confine their opinions to matters in issue which are certain or probable and not testify as

to mere possibilities. *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973).

The appellees claim summary judgment was proper because the Bacons offered no evidence Jessica's cerebral palsy was caused by the actions of the appellees. They also claim the Bacons' only expert witnesses, Dr. Buck and Dr. Wood, failed to qualify as experts on cerebral palsy, thus nullifying any testimony they offered on causation. Since the etiology of cerebral palsy is beyond the experience and knowledge of a lay jury, the presentation of this case is dependent upon the testimony of experts.

Both of the Bacons' expert witnesses gave contradictory testimony. Dr. Buck, an obstetrician from Lawrence, testified as to Dr. Pirotte's negligence. He stated the absence of any evidence of a congenital, anatomical problem with Jessica's lungs and airway, Dr. Pirotte's difficulty in bagging, and the time lapse before Jessica began to breathe on her own showed Dr. Pirotte was not reasonably adept at the bagging procedure. Dr. Buck testified that the cause of cerebral palsy cannot be determined in every case. When asked whether the hypoxia, both preceding the delivery and thereafter during the resuscitative period, caused Jessica's cerebral palsy, he answered that he believed the hypoxia before and after birth caused the baby's present condition and that proper resuscitation would have likely erased the effects of the earlier hypoxia. Later in the deposition, Dr. Buck gave the following testimony:

"Q: The diagnostic cause of cerebral palsy is ordinarily a neurological evaluation as opposed to an obstetrician and gynecologist's evaluation, is it not, sir?
"A: Yes.
"Q: All right. And when you're dealing with the causation of this child's cerebral palsy, that's basically a neurological question that you'd expect to be answered by a qualified pediatric neurologist, wouldn't you, sir?
"A: Yes.

. . . .
"A: . . . As I indicated earlier, *I would defer to a neurologist to state the link-up between the departure of care and resulting in CP.* I feel my role as an obstetrician is to discuss obstetrical management.

. . . .
"Q: . . . *Are you saying that as an obstetrician that you are not qualified to render an opinion and would defer to a neurologist as to whether the departure you had stated in this case caused CP in this instance?*

"*A: Yes.* And the reason for that is that the assessment of the infant by the neonatologist or neurologist is going to hopefully give you an impression as to whether there is something basically wrong with the child, such as a chromosomal abnormality or a congenital abnormality or whether the most likely cause of the problem is due to hypoxic events." (Emphasis supplied.)

The testimony of Dr. Judith Wood, a pediatrician from Las Vegas, pertained to pediatrician Dr. Fleming's handling of the case. Dr. Wood's only criticism of Dr. Pirotte's actions was that he should have called in Dr. Fleming at the same time he called in the obstetrician, Dr. Grimaldi.

Dr. Wood testified she believed several commissions and omissions by Dr. Fleming contributed to Jessica's cerebral palsy by adding unwarranted stress to the baby. Jessica was already in a stressful situation, which contributes directly to acidosis, which, in turn, can be a contributing factor in cerebral damage. The first omission was the failure to warm Jessica in a timely manner. The second was Dr. Fleming's failure to maintain the umbilical arterial catheter for longer than two and one-half hours when there was no intravenous line going at the time. Dr. Wood noted it was important in a neonate who has been stressed to keep some kind of intravascular line open in case of problems. Sometime after removing the catheter, Dr. Fleming did indeed try to reestablish an intravascular line on Jessica, in case it was needed suddenly, but was unable to do so during the eight attempts she made. Dr. Wood criticized these attempts as creating unnecessary stress for Jessica and stated after three failed attempts Dr. Fleming should have asked someone else to attempt to establish the line.

Dr. Wood criticized Dr. Fleming for allowing the mother to nurse Jessica twice within the first six hours of her birth. Oral feedings are usually withheld for at least 24 hours in high risk infants in order to avoid additional stress. One of her major criticisms was that Dr. Fleming did not obtain consultation from a level three neonatology center as early as possible.

After noting bloody stools, back and neck arching, and "extreme irritability," Dr. Fleming arranged for Jessica to be transported that afternoon to Children's Mercy Hospital in Kansas City, a level three neonatology center. During transport, Jessica had a seizure. An i.v. tube was attached, and she was given phenobarbital.

Dr. Wood testified she had never attended a child who has cerebral palsy, had never been asked to diagnose cerebral palsy, and does not hold herself out as an expert in determining the etiology of cerebral palsy. Her testimony on causation was as follows:

"Q: [D]o you have an opinion within a reasonable degree of medical probability as to whether or not there were any departures from standard approved medical care by Dr. Collette Fleming that caused cerebral palsy in this child, Jessica Bacon?

"A: Yes, I think it's quite possible.

"Q: All right. Can you state within a reasonable degree of medical *probability* rather than just that it is possible?

"A: *It's difficult for me to do.*

"Q: Are you stating then that you cannot state within a reasonable degree of medical probability that the care and treatment by Dr. Fleming caused cerebral palsy in this child?

"A: I don't think that need necessarily be the cause, but I think it was *at least a contributing factor.*

"Q: Within a reasonable degree of medical probability?

"A: Within a reasonable degree of medical probability.

. . . .

"Q: Doctor, can you state within a reasonable degree of medical probability that Jessica's cerebral palsy did not result from intrauterine hypoxia?

"A: It might have contributed to it.

"Q: Is that the best you can state?

"A: It could be a contributing factor but I don't think it was solely the cause of her subsequent neuromuscular problems.

"Q: I take it then that you can't state that the child's cerebral palsy resulted strictly or solely from post-birth problems?

"A: Yes, that's correct." (Emphasis supplied.)

In discussing Dr. Fleming's failure in establishing an i.v. tube on Jessica, Dr. Wood acknowledged it was a difficult procedure, which, because the infant's vein is so small, often fails. Dr. Wood's testimony continued:

"Q: . . . If we were to eliminate all those additional stresses or those potential additional stresses to the child, are you able to tell us that this child would not have cerebral palsy today?

"A: No.

"Q: Are you able to tell us that this child wouldn't have cerebral palsy to the same degree and to the same extent that it has today?

"A: *No.*

"Q: All of these things that you've identified are possibilities of being contributing factors at most; isn't that a fair statement?

"A: Right.
"Q: And, as to whether they were or not, you are unable to tell us simply because *you don't know?*
"A: *That's right.*
"Q: By reason of lack of information and by reason of lack of training and by reason of qualifications; is that a fair statement, ma'am?
"A: By reason of the fact that there are so many undeterminable factors *I don't think anybody could give you a correct answer.*" (Emphasis supplied.)

The trial court in its memorandum decision stated the problem as follows:

"During his deposition, Dr. Buck stated that the hypoxia caused the cerebral palsy and that the only question was whether the hypoxia causing the cerebral palsy occurred prior to or after birth. Later in his deposition, Dr. Buck testified that he was not an expert concerning cerebral palsy and its causes. Dr. Buck went on to state that it would be necessary to conduct a neurological evaluation by a pediatric neurologist in order to determine the exact cause of Jessica's cerebral palsy. He further testified that such a diagnosis was not within the realm of expertise of an obstetrician-gynecologist. Dr. Buck indicated that his testimony concerned the obstetrical management of the case and that he would defer to a neurologist on the question of causation.

"Plaintiffs' other expert is Judith Wood, M.D. Dr. Wood is a pediatrician. Dr. Wood testified concerning the standard of care concerning Defendant Fleming. Dr. Wood testified to several factors which caused the baby additional stress. Dr. Wood testified that she was not an expert with regard to the cause of cerebral palsy. She further stated that she could not testify that the deviations from standard approved medical care on the part of Defendant Fleming caused Jessica's cerebral palsy, or contributed to that condition.

"The question before this Court is whether or not, based upon their own testimony, Dr. Buck and Dr. Wood can testify as to the causes of cerebral palsy and the nexus between the deviation from standard of care and the cerebral palsy. The decision as to whether a witness qualifies as an expert and, if so, the area of expertise within which the expert can testify are discretionary decisions for the Court. . . .

". . . . The plaintiffs are entitled to try their case to a jury but only if the case is legally sufficient for submission. The jury cannot be expected to determine the issue of causation in this case without the aid of expert testimony. Who will qualify as an expert on cerebral palsy, the causes of cerebral palsy in general, and the specific cause of the cerebral palsy suffered by Jessica Bacon? By their own testimony, Dr. Buck and Dr. Wood cannot. If the plaintiffs' experts cannot, how can the jury?

. . . .
"Plaintiffs argue that it is clear hypoxia caused the cerebral palsy. However, it is frankly conceded that all children who suffer hypoxic episode do not develop cerebral palsy and that cerebral palsy can occur in the absence of any hypoxic

incident. Indeed, it is conceded that cerebral palsy can occur in the absence of any known cause. Plaintiffs sweep away these difficulties by taking the position that because Jessica has cerebral palsy and because Jessica suffered a hypoxic event, Drs. Buck and Wood can testify that the hypoxia caused the cerebral palsy.

"Based upon their own testimony, both Dr. Buck and Dr. Wood are not qualified to give an opinion as to the cause of Jessica's cerebral palsy."

The Bacons do not dispute that the causes of cerebral palsy are complicated and beyond the realm of a layman's knowledge and therefore must be proven by expert medical testimony. See *Funke v. Fieldman*, 212 Kan. 524. Instead they assert that their expert witnesses *have* shown that the cerebral palsy was caused by hypoxia, and whether it was caused by hypoxia suffered before or after birth is a question for the jury.

The Bacons base their contention the cause of the cerebral palsy is not in dispute on two opinion letters submitted by Dr. John Evans and Dr. Russell Nelson on behalf of appellees Pirotte and Fleming. These letters were provided in response to interrogatory answers requesting identification of expert witnesses and a summary of their opinions. Both doctors found Jessica's injury *was* the result of asphyxia *before* birth, but the trial court noted "it seems clear to the Court that the defendants' experts did not attempt to determine causation but rather assessed the case based upon the plaintiffs' discovery record."

The cause of Jessica's cerebral palsy has been vigorously disputed by the appellees throughout the record. The Bacons elected not to depose Dr. Evans or Dr. Nelson and did not attempt in any way to establish their theory of causation through other medical experts. The trial court noted that if the Bacons intended to use the appellees' expert witnesses to establish causation they were required to supplement their interrogatory responses to include these experts, to list the experts pursuant to the discovery conference order, and to state their change of position and their response to the summary judgment motions.

Defendant Mercy Hospital filed a motion for summary judgment on February 4, 1987, in which it alleged the Bacons had not provided evidence of causation. Appellees Fleming and Pirotte filed a motion for summary judgment on February 5, 1987, also alleging the Bacons had not provided any evidence that negligence had caused Jessica's cerebral palsy. Oral arguments were

held March 3, 1987. Appellees contend the trial court made clear it had already read the depositions and had serious concern about the causation questions at the oral argument of the motions for summary judgment, and therefore stated additional briefing would be accepted on the motions. A transcript of the oral argument is not contained in the record. The Bacons submitted no additional support and the court granted summary judgments on May 14, 1987. On June 5, 1987, the Bacons filed a memorandum in support of their motion to alter or amend judgment in which they attached affidavits from Dr. Buck and Dr. Wood which they asked the court to consider in changing its decision as to lack of evidence on causation.

In his affidavit Dr. Buck swears he is of the opinion the hypoxia after delivery caused Jessica's cerebral palsy. Dr. Wood testified the stress inflicted on Jessica after birth increased the severity of her palsy. On August 24, 1987, the court denied the motion, holding:

"The affidavits submitted by plaintiffs cannot be considered by the Court because there is no procedural rule allowing such a submission of affidavits at this point in the proceedings.

"Even if the affidavits are considered, they clearly contradict the deposition testimony of Dr. Woods and Dr. Buck. Clearly, an issue of fact can not be created in such a fashion. *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 661 P.2d 348 (1983).

"If the affidavits are not contradictory, then in reality they add nothing to the deposition testimony of Dr. Woods and Dr. Buck. It logically follows that the Court's previous ruling that the opinions of Drs. Wood and Buck as to causation are without adequate foundation based upon lack of expertise would be unaffected by the affidavits."

On appeal, the Bacons argue the court had authority to consider the affidavits pursuant to K.S.A. 1987 Supp. 60-256(e). This statute is inapplicable to this case. It applies to the filing of affidavits before summary judgment. Rather, K.S.A. 60-259(g) is applicable:

"In all cases where the ground of the motion [for new trial or amendment of judgment] is error in the exclusion of evidence, want of fair opportunity to produce evidence, or newly discovered evidence, such evidence shall be produced at the hearing of the motion by affidavit, or when authorized by the judge by deposition or oral testimony of the witnesses, and the opposing party may rebut the same in like manner."

The affidavits of Dr. Buck and Dr. Wood, filed after judgment, are attempts to bolster and fortify their deposition testimony.

They state they were of the opinion the hypoxic events occurring subsequent to Jessica's delivery caused or increased the severity of the cerebral palsy. There was no denial of fair opportunity to produce this evidence and the evidence is not newly discovered. The trial court was proper in not considering the affidavits. If there was sufficient evidence of causation to deny summary judgment, it must be on the basis of the depositions before the court at the time it made its decision. A party may not remain silent in the face of a motion for summary judgment and later claim there is additional evidence to support its claims. See *Stovall v. Harms,* 214 Kan. 835, 838, 522 P.2d 353 (1974). An affidavit cannot be used to controvert a prior sworn statement in order to create an issue of material fact and defeat a motion for summary judgment. See *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, 41-47, 661 P.2d 348 (1983).

The Bacons object to the trial court striking issues from consideration which were supported only by the Bacons' listing of publications in the pretrial order. They designated the *Accreditation Manual for Hospitals* (1980), *Standards and Recommendations for Hospital Care of Newborn Infants* (1977), and *Standards for Obstetrics-Gynecological Services* (19 ), as those publications which would show the negligence of defendant Mercy Hospital concerning hospital privileges, consultations, medical records, laboratory equipment, supplies, and capability.

The Bacons showed absolutely no connection between the cited volumes and these allegations of negligence when requested to do so in depositions. The expert witnesses gave no testimony as to these allegations. The trial court therefore properly held these volumes could not later be claimed to contain evidence of negligence which would become apparent at trial. Dr. Wood did consult Standards and Recommendation for Hospital Care for Newborn Infants in her criticism of Dr. Fleming's action and the court allowed the publication to be considered on this issue.

We hold the Bacons failed to present evidence that the acts of Mercy Hospital of Ft. Scott, Dr. Pirotte, and Dr. Fleming caused Jessica Bacon's cerebral palsy. The trial court properly granted summary judgment to appellees. In light of the foregoing holding, we do not reach the other issues raised by the Bacons.

The judgment is affirmed.