Rhonda L. ZYWICKI, individually, and Rhonda L. Zywicki, as Administrator of the Estate of Dathan James Zywicki, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 88–1501–FGT.

United States District Court, D. Kansas.

Dec. 4, 1992.

Richard D. Cordry, Cordry, Hund & Hartman, Wichita, KS, for plaintiffs.

Stephen K. Lester, Office of U.S. Atty., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

Plaintiffs, Rhonda Zywicki individually and as administrator of the estate of Dathan Zywicki, brought this medical malpractice action against the United States of America. Plaintiffs allege that Dr. Steven Yount, who was at that time an Air Force physician, committed malpractice in the treatment of Rhonda Zywicki's son, the decedent, Dathan Zywicki. The action was brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq.* This matter was tried to the court on October 20, 21, and 22, 1992. The court heard the testimony of a number of witnesses and had the opportunity to evaluate their demeanor and credibility. The parties have now filed their proposed findings of fact and conclusions of law. After considering the evidence presented and the arguments of the parties, the court now issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Tim Zywicki, father of the decedent, Dathan Zywicki, is and was at the time of Dathan's birth a member of the United States Air Force. Rhonda Zywicki is Dathan's mother. Dr. Steven Yount, who was an Air Force physician at the time of the occurrence leading to this action, was a servant of the United States.

2. Dathan Zywicki was born on November 10, 1983. At nineteen months of age, Dathan was diagnosed as having Hirschsprungs disease, a condition which deadens the nerves of the colon, thus preventing the bowel from functioning properly. Dathan underwent eight surgeries related to this problem. The last surgery was performed in December 1985 by Dr. Victor Garcia at Walter Reed Hospital in Washington, D.C. After that surgery Dathan appeared to develop normally.

3. In July 1985, the Zywickis moved to Wichita, where Tim Zywicki was stationed at McConnell Air Force Base ("McConnell"). Dathan had a check-up at McConnell Air Force Base in April 1986, performed by the pediatrician at the base, Dr. David Kenagy. At that time Dathan appeared to be in good health.

4. The evening of May 23, 1986, was routine, and there was no indication that Dathan was ill. However, at approximately 1:30 a.m. on May 24, 1986, Rhonda and Tim Zywicki were awakened by Dathan's screams. They discovered vomit on Dathan and in his bed. Rhonda Zywicki stayed up with Dathan. Dathan continued to vomit, and the emesis became darker after two hours. Rhonda had seen this before and recognized that it meant her son might be vomiting blood. At that time, approximately 3:30 a.m., she called the emergency room at McConnell and was told to bring Dathan to the hospital.

5. Upon arrival at McConnell, Dathan's vital signs were taken, and Dr. Steven Yount examined Dathan for twenty to thirty minutes. It was recorded at 4:20 a.m. that Dathan weighed twenty-seven pounds; his heart rate was 140 beats per minute; his breath rate was forty per minute; and his temperature was 102.3 degrees. Dr. Yount's examination included listening to Dathan's lungs and bowel and palpating Dathan's abdomen. Dathan was active enough to resist the examination, which Dr. Yount considered to be a good sign. The area around Dathan's mouth appeared pale, which is common in children with fevers. Dathan's lungs were clear, and he had no trouble breathing.

6. Dathan continued to vomit, and Dr. Yount noted that the emesis had a "coffee ground" appearance. Dr. Yount recognized that this often means the patient is vomiting a small amount of blood. The emesis tested positive for blood. Dr. Yount observed reduced bowel sounds, which indicated a possible bowel obstruction. Bowel obstruction would be consistent with Dathan's medical history.

7. Tim and Rhonda Zywicki provided Dr. Yount with Dathan's medical history, including the surgeries for treatment of Hirschsprungs disease. Dr. Yount had never treated a person who had undergone surgery for Hirschsprungs disease. Dr. Yount concluded that Dathan required treatment from a pediatric surgeon and went about finding one. At approximately 4:45, Dr. Yount located Dr. Philip Knight, a pediatric surgeon at HCA Wesley Medical Center ("Wesley") in Wichita. Dr. Knight agreed to see Dathan at Wesley, which is approximately fifteen minutes from McConnell. Dathan continued to vomit and had begun to have diarrhea. (It was estimated that Dathan vomited a total of fifteen to twenty times.)

8. Dr. Yount estimated that Dathan was mildly to moderately dehydrated. However, Dr. Yount determined that Dathan should not be given fluids, either orally or intravenously, for several reasons. First, there was not an immediate need for rehydration. Second, because of Dathan's previous surgeries and baby veins, an intravenous tube ("IV") would be difficult to safely insert. Third, Dathan was to be transferred immediately to a near-by hospital where surgery was a distinct possibility. Inserting an IV would have delayed transporting Dathan to Wesley.

9. Dr. Yount also determined that a nasogastric tube was not appropriate. A nasogastric tube is inserted into the nostril and then forced through the back of the throat, through the esophagus, and into the stomach. Its purpose is to compress the stomach to prevent vomiting. However, insertion of the tube can actually cause vomiting or internal bleeding. Inserting a nasogastric tube is traumatic and painful, and Dr. Yount concluded that the risks outweighed the benefits at that time.

10. An ambulance was prepared to take Dathan to Wesley. Just as the ambulance was ready to leave, at approximately 5:00 a.m., Dr. Yount was notified of an in-flight emergency. Pursuant to military orders, Dr. Yount took the ambulance to the landing site. The Zywickis were left at the McConnell hospital and advised not to take Dathan to Wesley themselves because it is risky to let a patient go unattended by any medical care providers. There were other ambulances at the hospital, but taking one of them would have required leaving the emergency room completely unattended.

11. Dr. Yount testified that although he did not know how long he would be gone, he did know that there would be a decision point within fifteen to thirty minutes, at which time other arrangements could be made for Dathan if Dr. Yount was unable to return. Dr. Yount was able to return to the hospital within thirty minutes. He briefly examined Dathan for any deterioration in his condition and sent him to Wesley at approximately 5:40. Dr. Yount testified that Dathan was in stable condition when he left McConnell.

12. Dathan arrived at Wesley, at approximately 6:00 a.m., and an examination at 6:15 a.m. revealed an elevated temperature (102), heart rate (172) and respiratory rate (44). According to the medical professionals who testified, none of the vital signs was alarming. Dr. Knight examined Dathan and found his condition to be stable. He exhibited good body tone; he was alert and responded appropriately to stimulation. Dr. Knight listened to Dathan's lungs and found them to be clear. Tim Zywicki reported that Dathan had not had any trouble breathing. Dr. Knight ordered an x-ray to help assess the situation.

13. The x-ray revealed a possible bowel obstruction or infection, and Dr. Knight told Tim and Rhonda Zywicki that their son would likely need surgery within 24 to 48 hours. The x-ray did not show any fluid in Dathan's lungs. Dathan's vital signs were taken again upon his return from x-ray, at approximately 7:15; his pulse was 168; his breath rate was 40; and his breathing was labored.

14. Dr. Knight ordered a barium enema and a second x-ray. Before the procedure could be performed, Dathan went limp and shortly thereafter began to have trouble breathing. At that time, the decision was made to admit Dathan into the Pediatric Intensive Care Unit ("PICU"). Dr. Knight ordered a nasogastric tube and IV, but told the emergency room nurse to wait until Dathan arrived at PICU. Dr. Knight testified that it is sometimes difficult to keep an intravenous tube in place while transferring a patient to another unit within the hospital.

15. Dathan was transferred to PICU at approximately 8:20 a.m. He was examined from head to toe and connected to a heart and respiration monitor. The registered nurse who examined Dathan testified that he was ill, but in stable condition when he was admitted to PICU.

16. Dr. Knight then examined Dathan and again ordered a nasogastric tube and an IV for rehydration. The nurses were in the process of starting the IV when Dathan began to exhibit respiratory distress; he went into cardiac arrest about five minutes later, at approximately 8:55 a.m. When Dathan went into cardiac arrest, cardiopulmonary resuscitation was administered without success. Dathan was pronounced dead at approximately 9:45 a.m.

17. The plaintiffs' case included the expert witness testimony of Dr. Jonathan Alexander. Dr. Alexander received his medical training at Down State Medical Center in Brooklyn, New York. He has had emergency room experience and continues to work part time in a walk-in emergency care facility. Dr. Alexander's primary source of

income at this time is performing insurance evaluations, although he also works five weeks a year as a camp physician.

18. Dr. Alexander testified that Dr. Yount failed to meet the standard of care in three ways: (1) failing to begin intravenous fluids; (2) failing to insert an nasogastric tube; and (3) taking Dathan's vital signs only once while he was at McConnell. In Dr. Alexander's opinion, Dathan was not in stable condition, but was in an on-going state of shock while he was at McConnell. He testified further that the alleged departures from the standard of care significantly contributed to the death of Dathan Zywicki.

19. The defendant presented the expert testimony of Dr. Mark Scarborough. Dr. Scarborough obtained his medical degree at the University of Missouri, Kansas City in 1979. He currently practices emergency medicine at St. Joseph Health Center in Kansas City, Missouri. Dr. Scarborough is board certified in emergency medicine.

20. Dr. Scarborough testified that in his opinion, Dr. Yount appropriately recognized Dathan's condition and referred him to a pediatric surgeon. He believed that Dr. Yount acted within the standard of medical practice at all times. In Dr. Scarborough's opinion, the failure to place a nasogastric tube or IV tube was also appropriate given Dathan's condition at the time and the plans to transfer Dathan to Wesley. As for the failure to repeat the taking of vital signs, Dr. Scarborough agreed that it is preferable to take vital signs more often than was done in this case. However, Dr. Scarborough did not believe the failure to do so was a violation of the standard of care. It is the nature of emergency room care that physicians must treat more serious cases first. In this case, it was appropriate for Dr. Yount to leave Dathan Zywicki to respond to the in-flight emergency.

21. The court, having had the opportunity to listen to the expert testimony and examine the demeanor of these witnesses, finds the testimony of defendant's expert, Dr. Scarborough, highly credible. On the other hand, the court was not impressed with the credibility of plaintiffs' expert witness. Dr. Alexander has been disciplined by the New Jersey State Board of Medical Examiners for having lied under oath in other medical malpractice trials. The court finds that this matter deters greatly from Dr. Alexander's credibility. More importantly, the testimony of plaintiff's expert does not comport with the medical evidence in the case or the realities of emergency room work. Dr. Alexander testified that Dr. Yount should have treated Dathan for aspiration of fluids, but there was no evidence of aspiration at the time. Dr. Alexander testified that Dr. Yount should have given Dathan intravenous fluids although the available medical evidence did not suggest such treatment was necessary. As for the failure to take repeated vital signs, Dr. Alexander did not account for the in-flight emergency to which Dr. Yount properly responded. Moreover, Dr. Alexander did not provide evidence that Dr. Yount's treatment contributed to Dathan Zywicki's death.

22. Dr. Knight, who is board certified in general surgery, pediatric surgery, and surgical critical care, testified that in his opinion Dathan Zywicki received appropriate treatment while at McConnell.[1] He believed that placement of a nasogastric tube or IV was not indicated at that time. Moreover, it is usually better to begin such treatment after moving the patient. Dr. Knight estimated that it would take three days for a child with Dathan's medical history to die of dehydration. There was no evidence presented that dehydration can be fatal within a matter of hours.

23. Dr. Mary Nielsen was the pathologist who conducted the autopsy on Dathan.

---

1. During Dr. Knight's testimony and at other points during the trial, the attorneys and witnesses mentioned the reports of several doctors who had examined the medical records in this case, but did not testify at trial. The court heard hearsay objections to this evidence, but admitted it on a qualified basis. The court now concludes that this evidence is inadmissible hearsay. Accordingly, the court will not consider those reports or the testimony concerning them in reaching its determinations.

Tim and Rhonda Zywicki had permitted a partial autopsy, but did not allow an examination of Dathan's brain. Dr. Nielsen testified that this was a very difficult case, and the cause of death was uncertain. The pathology report listed six findings in order of significance. Aspiration of fluid into the lungs was listed first on the pathology report. However, Dr. Nielsen could not say to a reasonable degree of medical certainty whether the aspiration occurred before Dathan arrested or as a result of the attempt at resuscitation or even after Dathan's death. Dr. Nielsen did testify that aspiration more likely occurred within an hour of Dathan's death than while he was at McConnell. The examination of some organs revealed signs of Reye Syndrome, listed second on the pathology report. However, Reye Syndrome usually follows a virus, and there was no evidence that Dathan had had a viral infection. The possibility of Reye Syndrome could not be ruled out without examination of the brain. No small bowel obstruction was found. The court finds the testimony of Dr. Nielsen highly credible and highly probative on the issue of causation.

24. Several medical witnesses testified that when fluid enters the lungs, the body reacts immediately. The patient will wheeze, and there will be inflammation of the lungs. When listening to the lungs, the medical care provider will notice rattles in the chest. All the medical care providers testified that Dathan's lungs sounded clear, both at McConnell and at Wesley. The x-ray did not reveal fluid in the lungs. Dathan did not show any difficulty in breathing until after he was at Wesley for over an hour.

25. According to the testimony of the medical care providers, heart and respiratory rates can vary significantly among children. Dathan's pulse and breath rate were somewhat high when he was at McConnell. However, Dathan had regularly had a relatively high heart rate and respiratory rate, even when he was not ill.

## CONCLUSIONS OF LAW

26. The plaintiffs, the heir at law of Dathan Zywicki and the administrator of Dathan Zywicki's estate, brought this action pursuant to the Federal Tort Claims Act (FTCA). 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671, *et seq.* The plaintiffs assert that the United States is liable for the alleged negligence of its servant, Dr. Steven Yount, on the basis of respondeat superior.

27. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b) and has personal jurisdiction over the parties. Venue is proper in this district. 28 U.S.C. § 1402(c). The court must apply the substantive law of Kansas, the state in which the cause of action arose. *See Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

28. The elements of a medical malpractice claim are: (1) a physician was negligent in his treatment of the decedent; (2) the physician's negligence caused harm; and (3) the plaintiff suffered damages. *Cleveland v. Wong,* 237 Kan. 410, 416, 701 P.2d·1301 (1985).

29. The United States, acting through Dr. Yount, owed Dathan Zywicki the duty of care as a reasonable medical professional under the circumstances. The Kansas Supreme Court has described the duty of care owed by a physician as follows:

"A physician is obligated to his patient to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations.

*Durflinger v. Artiles,* 234 Kan. 484, syl. ¶ 3, 673 P.2d 86 (1983).

30. In order to recover, the plaintiffs must prove negligence, a breach of the duty of care.

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs.... An accident which is not reasonable to be foreseen by the exercise of reasonable care and prudence is not sufficient grounds for a negligence action."

*Id.* at 488, 673 P.2d 86. "What constitutes negligence in a particular situation is judged by the professional standards of the particular area of medicine with which the practitioner is involved." *Id.* at 490, 673 P.2d 86.

31. Under Kansas law negligence is not presumed and cannot be inferred merely from an adverse result. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988); *Durflinger*, 234 Kan. at 488, 490, 673 P.2d 86. The plaintiff has the burden to prove both negligence and causation. *Bacon*, 243 Kan. at 307, 756 P.2d 416. This requires expert testimony unless these elements are apparent to the average layman. *Id.; Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22, 25 (1978). Expert witnesses must confine their opinions to matters in issue which are certain or probable and are not to testify as to mere possibilities. *Bacon*, 243 Kan. at 307, 756 P.2d 416.

32. The plaintiffs have failed to show by a preponderance of the evidence that Dr. Yount's treatment of Dathan Zywicki violated the standard of care in any way. According to the great weight of the evidence, Dr. Yount properly referred Dathan to Dr. Knight and exercised "reasonable and ordinary care and diligence" in treating Dathan.

33. The plaintiffs have also failed to prove causation. The evidence does not show that the conduct of Dr. Yount, even if negligent, significantly contributed to the death of Dathan Zywicki. Dathan Zywicki was at McConnell for no more than eighty minutes. His condition was stable when he left McConnell, and his vital signs had not changed dramatically when he arrived at Wesley. Dathan was at Wesley for more than two hours before his condition began to deteriorate significantly. The cause of Dathan's death is uncertain, according to the autopsy results and the testimony of the doctors in this case. Therefore, it is impossible to conclude that any action or failure to act by Dr. Yount was a significant causal factor of Dathan's death.

## CONCLUSION

The death of a child is one of the greatest tragedies a family can experience. The court is sympathetic to the grief of the Zywickis and their desire to find an answer to the painful question of why their son is no longer with them. However, the court, like the medical professionals involved in this case, is unable to answer that question.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of the defendant on all claims. Costs shall be assessed against the plaintiffs.