Duane ROESCH, Plaintiff,

v.

Ted J. CLARKE, M.D., Defendant.

Civ. A. No. 93–4092–DES.

United States District Court,
D. Kansas.

Aug. 15, 1994.

Tom C. Kelley, Tom Kelley, P.A., Topeka, KS, for plaintiff.

Michael R. O'Neal, Gilliland & Hayes, P.A., Hutchinson, KS, for defendant.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

### I. INTRODUCTION

This matter is before the court on defendant Dr. Ted. J. Clarke's motion for summary judgment (Doc. 27). In the instant action, plaintiff Duane Roesch claims defendant committed medical malpractice. Specifically, plaintiff claims that defendant misdiagnosed his injury and failed to render appropriate care. The issues are fully briefed and the court is ready to rule.

### II. SUMMARY JUDGMENT STANDARDS

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the

movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1985). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

■ The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1985). The nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to the interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Rule 56(e)).

■ Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

■ A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

■ The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

## III. *FACTUAL BACKGROUND*

The following facts are uncontroverted for the purposes of this motion.[1]

---

1. Rule 56(e) requires a nonmovant to respond to a properly made and supported motion for summary judgment by setting forth specific facts which show there is a genuine issue for trial. Defendant's motion was properly made and supported. It complied with both Rule 56 and District of Kansas Rule 206(c). Therefore, plaintiff had the burden to set forth specific facts showing genuine issues.

District of Kansas Rule 206(c) addresses the manner in which a nonmovant is to set forth the specific facts. It provides, in pertinent part, that "[e]ach fact in dispute ... shall refer with particularity to those portions of the record upon which the opposing party relies." It further provides that "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."

In his memorandum in opposition, plaintiff attempts to controvert defendant's statement of uncontroverted facts without citing to any supporting facts. Instead, he relies only on unsupported, general allegations. Such a response does not comply with either Rule 56 or District of Kansas Rule 206(c). Accordingly, to the extent defendant's factual statement is supported by the record, the court has deemed it to be admitted.

On June 12, 1990, plaintiff injured his right arm and shoulder when he tried to keep from falling over the side of his father's truck. On June 18, 1990, plaintiff went to the Colby Medical and Surgical Center where he was examined by Dr. Tom Henderson. Dr. Henderson noted that plaintiff had good range of motion in his right shoulder except for abduction. Dr. Henderson concluded that plaintiff had a muscle strain with a possible tear of the medial head of the biceps. He prescribed Naprosyn, 375 mg TID, and instructed plaintiff to apply ice twice daily and elevate his right arm.

Plaintiff returned to the Center on June 25, 1990. He was examined by Dr. Hildyard.[2] Dr. Hildyard diagnosed a possible rupture of the biceps. He referred plaintiff to defendant for a follow-up evaluation.[3]

Defendant examined plaintiff on July 3, 1990. Defendant interviewed plaintiff and obtained his medical history. Plaintiff indicated that his pain had decreased but he still could feel a lump in his arm. Defendant noted a decrease in swelling and ecchymosis. He also noted that plaintiff had a full range of active and passive motion in his right shoulder,[4] 5+ biceps strength with an obvious mass adjacent to his right biceps, increased discomfort with abduction against resistance, full forward flexion, and full extension. Defendant concluded plaintiff suffered an acute biceps tendon rupture with intact long head. He also diagnosed ongoing shoulder pathology with impingement syndrome.

Following the examination, defendant discussed his findings and conclusions with plaintiff. Defendant's consultation notes state as follows:

RECOMMENDATIONS:

1. I discussed with Duane and his wife Charlotte, the implications of this. It is my suspicion he will lose 5 to 10% power, though for most people this does not cause a functional disability. I have told him that an operation is available to reattach the biceps tendon but this would require a period of immobilization to allow the tendon to heal. In my opinion, this is an operation done for people who have a life style which involves performing athletics or shoulder function on the most highest level (professional baseball pitchers). I have advised him to accept the lump in his arm. The other biceps tendon will hypertrophy. I will check him back in six weeks if he is still having discomfort. I have advised him not to do overhead lifting activities while the tendon hypertrophies.

Plaintiff never returned.

Following his visit to defendant, plaintiff went back to work where he put in five to six hour days. Plaintiff still experienced pain when he used his right arm to perform overhead tasks. On August 2, 1990, he telephoned Dr. Barry Turner, an orthopedist in McCook, Nebraska. Dr. Turner ordered an MRI which was performed August 3, 1990. He did not examine plaintiff until August 15, 1990. By this time, plaintiff could not raise his arm forward or laterally. Based on plaintiff's inability to raise his arm, Dr. Turner diagnosed a rotator cuff tear.[5] Dr. Tur-

---

2. The record does not reveal Dr. Hildyard's first name.

3. Defendant is an orthopedist who resides and practices in Denver, Colorado. During the period relevant to this lawsuit, he occasionally would travel to Colby, Kansas, where he provided orthopaedic consultations at the Colby Medical & Surgical Center.

4. Defendant's consultation notes do not specifically mention "active" or "passive" but state as follows: "EXAM: Right shoulder shows full range of motion." In his deposition, defendant explained that the tests he conducted reflect both active and passive motion. Dr. Barry Turner confirmed that orthopedists often refer to both active and passive motion in this manner. Plaintiff produces no facts to controvert defendant's explanation. Indeed, in his response, plaintiff specifically states that this paragraph (paragraph seven) of defendant's factual statement is uncontroverted.

5. Dr. Turner prepared an opinion letter dated December 17, 1991. In this letter, he lists four injuries which he discovered during his examination of plaintiff. The injuries are as follows: (1) chronic tear of the rotator cuff, right shoulder; (2) impingement syndrome with prominent and tear acromion; (3) partial tear of the bicipital tendon long head; and (4) fracture distal clavicle on right with partial AC separation.

ner performed surgery on plaintiff to repair the torn rotator cuff and biceps.

Dr. Turner was deposed on January 5, 1994. In his deposition, Dr. Turner admitted that plaintiff did not receive a good result from surgery. Dr. Turner also stated that he has no standard practice for conducting follow-up on patients receiving the same surgery as plaintiff. After his surgery, plaintiff attended approximately 15 physical therapy sessions with the first on September 5, 1990, and the last on October 15, 1990. He did not return to Dr. Turner until February of 1991. Dr. Turner is unsure whether plaintiff received any post-operative care from October 15, 1990 to February of 1991. In his deposition, Dr. Turner admitted that plaintiff's post-operative care was not good. He also stated that failure to complete physical therapy is a "very high cause of poor patient outcome after surgery."

The deadline for the designation of expert witnesses was September 30, 1993. At that time, plaintiff had designated only one expert: Dr. Turner. Plaintiff since has moved to designate another expert. Magistrate Judge Ronald C. Newman denied his motion in a Memorandum and Order dated May 16, 1994. Dr. Turner remains his only expert.

In his deposition, Dr. Turner agreed that an individual's ability to lift his arm and go through a full range of active and passive motion would be a sign to a physician that that individual did not have a rotator cuff injury. He also agreed that if plaintiff exhibited a full range of motion in his shoulder during his July 3, 1990, examination by defendant, a torn rotator cuff diagnosis would be unsupported. The consultation notes defendant prepared after his examination of plaintiff state that "[r]ight shoulder shows full range of motion." It is uncontroverted that plaintiff exhibited a full range of both active and passive motion during the July 3, 1990, examination.[6]

Any opinion Dr. Turner may have as to whether plaintiff required surgery on July 3, 1990, would be based on whether plaintiff had active range of motion on that date. Dr. Turner admits that if plaintiff exhibited the same factors to him as he did to defendant on July 3, 1990—ability to lift his right arm and an improving condition—he would have treated plaintiff as did defendant. He also admits that if plaintiff had full active and passive range of motion on August 7, 1990, when he examined him, he would not have operated.

On February 15, 1993, a Screening Panel convened to review plaintiff's contentions and defendant's response. The Panel consisted of John Gatz, Dr. Gary Harbin, M.D., Dr. Wallace Holderman, M.D., and Dr. Howard Wilcox, Jr., M.D. The Panel described the pertinent standard of practice to be as follows:

> Based on the medical records and x-rays available to Dr. Clarke on July 3, 1990, and based on the complaints of Mr. Roesch, as reflected in the medical records submitted to the panel with his contentions, the screening panel determines the following standard practice to be the appropriate standard of practice for a consulting orthopaedic specialist:
>
> 1. Interview the patient to obtain a history of the patient's complaint and injury.
>
> 2. Conduct a physical examination to determine range of motion; and
>
> 3. Institute a plan of treatment with follow up appropriate to the assessment based on the history and examination.

Dr. Turner agrees with the panel's statement of the standard of care.

The Panel further concluded that defendant met the standard of care. Specifically, the Panel wrote as follows:

---

Dr. Turner's diagnosis differs from defendant's as to injuries (1) and (4). As to injury (4), Dr. Turner's testimony indicates that the fracture and separation pre-dated plaintiff's June 12, 1990, injury. Specifically, his testimony indicates that the fracture was a "prior healed frac-

ture" and there were prior arthritic changes in the distal clavicle.

**6.** *See* Defendant's Statement of Uncontroverted Facts paragraph seven and Plaintiff's Response to Defendant's Statement of Uncontroverted Facts paragraph one.

The screening panel concludes that Dr. Clarke did not depart from the standard of care for the following reasons:

1. On July 3, 1990, Dr. Clarke conducted an appropriate interview of Mr. Roesch and obtained an adequate medical history including a description of injury and patient complaints.

2. On July 3, 1990, Dr. Clarke conducted an adequate physical examination which included a review of x-rays.

3. On July 3, 1990, Dr. Clarke instituted a plan of treatment with a follow-up consultation in six weeks.

Dr. Clarke's assessments of "acute biceps tendon rupture with intact long head ..." and "ongoing shoulder pathology with impingement syndrome ..." was consistent with and supported by the patient's history, complaints, examination, and x-rays as taken by or reviewed by Dr. Clarke on July 3, 1990. The assessment and plan of treatment with follow up is supported by published literature including Turek, Samuel L., *Orthopaedics*, 4th Edition, which is attached to Dr. Clarke's response as Appendix A. The medical records of the patient's initial visit reflect that patient experienced relatively good function with the arm and shoulder, and it is the opinion of the panel that special studies, including MRIs or arthrograms were not then warranted and that the initial treatment instituted was consistent with published literature, including those authorities contained in the Screening Panel Response of Ted J. Clarke, M.D.

In an opinion letter dated December 17, 1991, Dr. Turner stated that he had operated on plaintiff on August 15, 1990. In the letter, he states as follows:

In my opinion, had the above-referenced surgery been performed immediately after the date of injury, the results achieved would have been far better. In my opinion, Duane's disability and loss of use of the injured area would have been 65% better than achieved by the surgery in August of 1990. Had the surgery been performed, Duane's loss and pain would have been much less.

However, in his deposition, Dr. Turner stated that his opinion as to plaintiff's loss of chance was "just a guess" and not based on any particular standards or even his own experience.

## IV. DISCUSSION

This is a diversity case which is governed by Kansas law. The court must ascertain and apply Kansas law to reach the same result that a Kansas court would reach. *Adams–Arapahoe School District No. 28–J v. GAF Corp.*, 959 F.2d 868, 870 (10th Cir. 1992).

Under Kansas law, every physician has the duty to use reasonable and ordinary care and to exercise that reasonable degree of learning, skill, and experience which is ordinarily possessed by other physicians in the same or similar locations. *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86, 92 (1983) (quoting *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 574 P.2d 136, 138 (1977)). In order to prove medical malpractice, an injured patient must prove that his physician breached the professional duty of care, that the breach caused him harm, and that he has suffered actual damages. *Zywicki v. United States*, 809 F.Supp. 823, 828 (D.Kan.1992).

Liability does not arise merely from bad results. *Bacon v. Mercy Hospital of Ft. Scott*, 243 Kan. 303, 756 P.2d 416, 420 (1988). An injured patient must show both that the physician was negligent—that he breached the applicable standard of care—and that the negligence caused the injury. *Bacon*, 756 P.2d at 420. In order to show that the physician breached the standard of care and caused him injury, the patient ordinarily must provide expert medical testimony. *See, e.g., Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390, 397–98 (1991); *Bacon*, 756 P.2d at 420; *Webb v. Lungstrum*, 223 Kan. 487, 575 P.2d 22, 25 (1978). The only exception to this rule, the "common-sense" exception, applies where "what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowl-

edge and experience of mankind generally." *Webb*, 575 P.2d at 25. Plaintiff does not argue that the exception applies. Nor do the facts support its application. Thus, plaintiff must present expert medical testimony that defendant "either did not possess the requisite degree of skill or failed to use reasonable care and diligence in applying such care and skill," *Sharples*, 816 P.2d at 397, and that defendant's failure to use reasonable care proximately caused the injuries and damage for which he seeks relief. Plaintiff produces no such evidence.

Plaintiff contends that defendant committed malpractice by misdiagnosing his injury and failing to render appropriate care. His only expert medical evidence is provided by Dr. Turner. However, there has been some controversy over Dr. Turner's status as plaintiff's expert. In his deposition, Dr. Turner indicated that he thought he was to testify only as a treating physician. He also stated that he did not wish to testify as plaintiff's expert witness. Following Dr. Turner's deposition, plaintiff moved to designate a new expert. In a Memorandum and Order filed May 16, 1994, Magistrate Judge Ronald C. Newman considered plaintiff's motion. In that Memorandum and Order, Magistrate Judge Newman wrote as follows:

> [d]uring the deposition, [Dr. Turner] rendered opinions considering facts apparently not previously disclosed to him by plaintiff's counsel. It appears that the deposition of Dr. Turner simply did not go well from the plaintiff's standpoint and that plaintiff now wants to designate a new expert witness. The fact that an expert witness does not withstand cross-examination during his deposition in the manner hoped or anticipated, however, does not

establish good cause for designating a new expert witness.

He subsequently denied plaintiff's motion. Insofar as plaintiff has any expert testimony at all, it is provided by Dr. Turner.

Dr. Turner wrote two opinion letters regarding plaintiff's condition. In addition to the two opinion letters, Dr. Turner has been deposed. He was deposed after he had written the letters. In the letters, Dr. Turner states his opinion that plaintiff would have had a better chance for a full recovery, and would have been left with less pain, if he had received reconstructive shoulder surgery soon after the June 12, 1990, accident. However, the letters themselves do not establish a standard of care or clearly indicate that defendant breached the relevant standard. In neither letter does Dr. Turner specifically refer to defendant or his treatment of plaintiff.

Dr. Turner admitted in his deposition that he wrote the letters without first reviewing defendant's consultation notes or any other information regarding what went on at the July 3, 1990, examination. Although the letters express a general opinion, they do not provide an evaluation of defendant's specific actions within the context of the applicable standard of care. However, at his deposition, Dr. Turner was given an opportunity to review defendant's consultation notes and evaluate his specific actions. After being given this information, and after evaluating defendant's conduct within the context of the relevant standard of care, Dr. Turner appears to ratify defendant's actions.[7] Indeed, at one point in his deposition, after adopting the screening panel's articulation of the applicable standard of care, Dr. Turner specifically agrees that defendant met that standard.[8] Perhaps more importantly, Dr. Tur-

---

**7.** For instance, at his July 3, 1990, examination, plaintiff exhibited a full range of motion in his right shoulder, both active and passive. Defendant advised plaintiff that surgery was an option but recommended that plaintiff undergo conservative treatment (that is, forego surgery). At page 43 of his deposition, Dr. Turner endorsed defendant's actions when he agreed that if plaintiff had demonstrated a full active and passive range of motion when he saw him in August of 1990, as he did when defendant examined him in July of 1990, it would have been proper to treat plaintiff conservatively. Moreover, at page 49 of

his deposition, Dr. Turner acknowledged that one would not perform surgery just to repair a biceps tendon tear such as plaintiff's.

**8.** At page 48 of his deposition, after defendant's counsel explained the Panel's articulation of the applicable standard of care, and Dr. Turner agreed with that standard, the following exchange took place:

> Q: All right. And based upon what you've told us and assuming that Dr. Clarke's testimony about active range of motion being implied

ner nowhere states or implies that defendant failed to meet the applicable standard.

▮ Defendant moves for summary judgment arguing that plaintiff fails to support his claim with the requisite expert medical testimony. Specifically, he argues that plaintiff is unable to show negligence or causation. In support he points to the Screening Panel's conclusion that he met the applicable standard of care. He also points out that Dr. Turner, plaintiff's sole expert, testified during his deposition that defendant met the applicable standard. Essentially, defendant argues that plaintiff is without any expert testimony that would controvert this evidence and, thereby, create a genuine issue of material fact as to his alleged negligence. In his memorandum in opposition, plaintiff points to no specific testimony or statement which would raise a genuine issue as to defendant's negligence. Instead, he relies on general allegations and vague references to the record. His response is inadequate to avoid summary judgment.

Plaintiff also appears to contend that defendant was negligent in failing to perform additional tests. Again, he presents no expert medical evidence in support. Dr. Turner, his sole expert, never states that defendant's failure to perform additional tests breached the standard of care. Nor does Dr. Turner discuss defendant's choice of tests within the context of the applicable standard. On the other hand, defendant produces a report from the Screening Panel which concluded that "special studies, including MRIs or arthrograms were not then warranted." Plaintiff points to no evidence which controverts the Panel's conclusion.

In summary, plaintiff claims that defendant misdiagnosed his injury and failed to render appropriate treatment. The instant case is not within the "common-sense" exception. Therefore, plaintiff must produce expert medical testimony to support his claim. Dr. Turner is plaintiff's sole source of expert medical testimony. Nowhere in Dr. Turner's testimony, or in his opinion letters, does he

in his report, just as it is in yours, is true, *Dr. Clarke indeed met the applicable standard of care on July 3rd, 1990, based upon your review of his consultation report?*

indicate that defendant breached the applicable standard of care. In fact, in his deposition, Dr. Turner specifically agrees that defendant met the applicable standard. Without expert medical testimony that defendant was negligent, the court must grant defendant summary judgment. *Cf. Sharples,* 816 P.2d at 398 (holding that trial court correctly granted defendant summary judgment where plaintiff had no expert medical testimony that the defendant's alleged negligence was the proximate cause of plaintiff's injury); *Webb,* 575 P.2d at 25–26 (holding that summary judgment was appropriate where plaintiff had no expert medical evidence that defendant's failure to order an x-ray of plaintiff's injury breached the applicable standard of care).

## V. CONCLUSION

Federal Rule of Civil Procedure 56(e) states as follows:

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Defendant supports his motion for summary judgment as provided in Rule 56. In response, plaintiff does not point to any specific facts showing there is a genuine issue for trial. Instead, he relies on general allegations and vague references to opinions expressed by Dr. Turner in his opinion letters and deposition. After examining the parties' memoranda and factual submissions, the court finds that defendant is entitled to judgment as a matter of law.

**IT IS BY THE COURT THEREFORE ORDERED** that defendant's motion for summary judgment (Doc. 27) is granted.