NOT DESIGNATED FOR PUBLICATION

No. 119,216

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THE ESTATE OF JORDYN DOTY,
by and Through Its Duly Appointed Special Administrator Kimberly Doty,
and KIMBERLY DOTY, Heir at Law of Jordyn Doty,
*Appellants*,

v.

MICHAEL A. DORSCH, P.A., RODNEY S. DILL, M.D.,
GREAT PLAINS HEALTH ALLIANCE, INC.,
and RAWLINS COUNTY HEALTH CENTER,
*Appellees.*

MEMORANDUM OPINION

Appeal from Rawlins District Court; KEVIN BERENS, judge. Opinion filed October 11, 2019. Affirmed.

*Melinda G. Young*, of Bretz & Young, L.L.C., of Hutchinson, for appellants.

*Peter S. Johnston* and *Jacob E. Peterson*, of Clark, Mize & Linville, Chartered, of Salina, for appellee Rawlins County Health Center.

*Nathan D. Leadstrom*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for appellee/cross-appellant Great Plains Health Alliance, Inc.

*Randall H. Elam*, of Law Offices of Randall H. Elam, of Wichita, for appellee Rodney S. Dill, M.D.

No appearance by appellee Michael A. Dorsch, P.A.

1

Before POWELL, P.J., GARDNER, J., and LAHEY, S.J.

POWELL, J.: Jordyn Doty died on June 9, 2013, following a tragic one-car accident that occurred the day before. Nearly two years after Jordyn's death, her mother, Kimberly Krebs (formerly Doty), received a call from the Kansas Board of Healing Arts informing her the Board had received information that Michael A. Dorsch, a physician's assistant at the Rawlins County Health Center (RCHC), had had sexual contact with Jordyn. Dorsch had treated Jordyn for various ailments for several years prior to her death.

This report and other information prompted Jordyn's estate and Kimberly to file suit against Dorsch; Dr. Rodney Dill, Dorsch's supervising physician; RCHC, the hospital which employed both Dorsch and Dr. Dill; and Great Plains Health Alliance, Inc. (Great Plains). The Estate alleged: (1) Dorsch had overmedicated and sexually assaulted Jordyn; (2) all of the defendants had been negligent in the medical care they had provided to Jordyn both before and after the accident; (3) Dr. Dill, RCHC, and Great Plains had been negligent in the hiring, supervision, and retention of Dorsch; and (4) RCHC and Great Plains were vicariously liable for the negligence of their two employees, Dorsch and Dr. Dill. Jordyn's estate sought damages for pain and suffering, mental anguish and severe emotional distress, and physical distress and death suffered by Jordyn. Kimberly sought all damages allowed under the wrongful death statutes.

The district court granted the defendants summary judgment on all claims, holding that all causes of action arising out of any acts or omissions occurring prior to June 8, 2013, were time barred. As for the causes of action arising out of acts occurring on June 8 and 9, 2013—the dates Jordyn was treated for her injuries from the car accident and the date she died—the district court held there was no evidence Jordyn had been sexually assaulted on those days and the plaintiffs had not presented any expert testimony establishing a breach of the standard of care for the medical treatment Jordyn received.

2

The plaintiffs now appeal the district court's adverse summary judgment ruling. For reasons more fully explained below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Before delving into the facts of this case an introduction of the various parties involved is helpful. Kimberly brought this action both as the administrator of Jordyn's estate and as Jordyn's heir at law (collectively referred to as the Estate).

RCHC is a critical access county hospital in Atwood, Kansas, that is organized and operated under K.S.A. 19-4601 et seq., by the Board of Trustees. RCHC directly employs the hospital's administrator and all the staff serving the hospital. RCHC employed Dorsch as a physician's assistant, and Dr. Dill supervised him.

Great Plains provides services as an independent contractor to RCHC under the terms of a Management Agreement. Great Plains does not own, lease, or operate RCHC. Great Plains has never done business under the name of "Rawlins County Health Center." Under the terms of this Management Agreement, Great Plains assisted RCHC with contracts and purchases, preparing cost reports, and providing a "Central Office [of] shared core services," which is essentially software to help RCHC manage and operate the hospital. Great Plains' Regional Vice President attended each monthly RCHC Board meeting, attended meetings of the RCHC's medical staff, and provided advice when specifically requested by the Board or hospital administrator.

Both Great Plains and RCHC's Board were responsible for the oversight, supervision, and direction of RCHC's Administrator, who was directly hired by RCHC and was RCHC's employee. RCHC's Administrator was directly responsible for the day-to-day supervision of RCHC's premises, medical staff, and employees, including Dorsch and Dr. Dill. Great Plains had no authority to make or overrule any decisions of RCHC

3

on employment issues including, without limitation, the hiring, discipline, or termination of any employees of RCHC. Great Plains has never employed or paid any wages, benefits, employment taxes, or other authorized withholdings for any of the employees of RCHC at any time for the period in dispute in this case. According to Dorsch, RCHC and Great Plains were responsible for hiring, supervising, disciplining, and retaining Dorsch during his employment at RCHC. Yet according to the Management Agreement, Great Plains never had authority or exercised any oversight, supervision, or control over any employee of RCHC at any time during the period in dispute in this case. In November 2013, five months after Jordyn's death, Great Plains' Regional Vice President, Les Lacy, was appointed by the RCHC Board to act as the interim Administrator of RCHC while the Board conducted a search for a new administrator. He held this position for three months, leaving in February 2014.

The pertinent facts of the case are that Dorsch provided care to Jordyn from 2011 through June 9, 2013. Jordyn turned 18 years old on April 25, 2011. The Estate alleged in its first amended petition that during the time Jordyn was under Dorsch's care, Dorsch had a sexual relationship with her and that he repeatedly overmedicated her to the point of incapacity. However, there were no alleged periods of incapacity after May 2012.

Jordyn was diagnosed with rheumatoid arthritis at age seven and later diagnosed with Hashimoto's Disease. In 2011, she was treated for three sexually transmitted infections which appear to have caused reactive arthritis that began in October 2011. Jordyn received health care at RCHC for a myriad of other issues. "She had a flurry of relapsing pain complaints which led to almost daily medical visits and frequent short hospital stays." Of note, Jordyn attempted suicide in March of 2012. The interactions between Jordyn and Dorsch waned when Jordyn began dating Matt Hafer in July 2012. The last time Jordyn received care at RCHC prior to her death was March 27, 2013. It is unclear who treated Jordyn at that appointment as the medical record simply states "physical therapy for massage."

4

On June 8, 2013, Jordyn was the passenger in the vehicle Hafer, her then-fiancé, was driving; Hafer was legally intoxicated with a blood alcohol level of .11. Jordyn was not wearing her seatbelt at the time of the accident, and she was partially ejected from the vehicle.

Shortly after the accident, Jordyn was transported from the scene to RCHC. She was totally nonresponsive in the ambulance and was placed on life support after arriving at RCHC. When Jordyn arrived at RCHC at 11:29 p.m., her score on the Glasgow Coma Scale was a 3—the lowest possible for this neurological test. In accordance with Kimberly's request, Jordyn was transferred to a trauma hospital in Denver, Colorado, shortly after midnight, where she died on June 9, 2013. The autopsy found that Jordyn died from severe craniocerebral injuries due to blunt force head trauma caused by the accident.

In the first part of April 2015, Kimberly received a call from "Laura" at the Kansas Board of Healing Arts who told Kimberly that it had been brought to the Board's knowledge that there had been sexual contact between Jordyn and Dorsch. Kimberly had no prior knowledge of this alleged sexual contact.

Following this phone call, on June 8, 2015, the Estate sent a written notice—purporting to be notice pursuant to K.S.A. 2014 Supp. 12-105b—to a variety of officials with Rawlins County, RCHC, and Great Plains. On the same day the Estate filed a petition in the Rawlins County District Court against Dorsch, Dr. Dill, and Great Plains for: (1) personal injury; (2) medical malpractice and/or professional services by a health care provider; (3) negligent hiring, supervision, and retention; (4) vicarious liability; (5) outrageous and abusive conduct or intentional infliction of emotional distress; and (6) wrongful death. The Estate stated that although the 120 days had not passed—in fact no days had passed—since the notice to RCHC of a pending suit required by K.S.A. 2014 Supp. 12-105b, it anticipated seeking leave of the district court to amend its petition and

adding RCHC as a party defendant after the required statutory time period had passed. On December 16, 2015, the Estate filed its first amended petition adding RCHC as a defendant.

The Estate alleged Jordyn had been "incapacitated by her medical conditions and/or during periods in which she was overly medicated by Defendant Dorsch." However, Kimberly testified in her deposition that there had been no periods in which Jordyn had been overmedicated or incapacitated after April or May of 2012. Kimberly also admitted she had no personal knowledge or information that Dorsch had any sexual interaction or contact with Jordyn at any time, including on June 8 or 9, 2013. Although the Estate's first amended petition alleged that Dorsch had sexually assaulted Jordyn on the night of the fatal accident, Kimberly testified that she had no knowledge of where that information had come from other than possibly the call she received from the Kansas Board of Healing Arts. Jordyn's autopsy did not indicate any signs of sexual assault. In her deposition, Kimberly testified that she was not aware of any injury caused by Dorsch's actions at any time from October 2011 through June 8, 2013.

While Lacy was acting as the interim Hospital Administrator for RCHC, in either November or December of 2013, he became aware for the first time of a complaint against Dorsch based upon a call he received about a Kansas Board of Healing Arts investigation. Lacy understood from the call that the complaint was of alleged sexual misconduct on the part of Dorsch with a patient other than Jordyn. No complaints or disciplinary actions against Dorsch had been brought to the attention of any employee, agent, or representative of Great Plains prior to Jordyn's death. In fact, the first time Great Plains learned of Dorsch's alleged sexual misconduct with Jordyn was in 2015 upon receipt of the presuit notice and petition in connection with the allegations made by the Estate.

6

During discovery, the Estate designated Dr. Norman V. Kohn, a psychiatrist and neurologist in Chicago, Illinois, as an expert witness on the issues of the standard of care, breach of the standard of care, causation, and damages. Dr. Kohn provided an expert report on Dorsch's care of Jordyn and "focused on the relationship between Jordyn Doty and Mr. Michael Dorsch, as reflected in her medical care." Dr. Kohn identified numerous events with reference to care recorded in Jordyn's medical records in 2011 and the first part of 2012 that, in his opinion, showed Dorsch's failure to maintain appropriate professional boundaries.

Dr. Kohn acknowledged that the interaction between Jordyn and Dorsch waned in 2012 after Jordyn became engaged to Hafer. He also acknowledged that Jordyn was ejected from a car on June 8, 2013, and suffered fatal injuries after she and Hafer had been drinking. Significantly, Dr. Kohn states: "Whether the relationship was physically consummated is neither clear from the records nor essential for this consideration to apply." Dr. Kohn opined on causation as follows:

> "Mr. Dorsch's inability to observe the boundaries of his professional roles, and his blurring of personal and professional relationships with his patients, compromised Jordyn Doty's medical care and exercised improper influence over her, contributing to impulsive and self-injurious actions by [Jordyn]."

He continued:

> "Mr. Dorsch failed to maintain proper sexual boundaries with his patient, Jordyn Doty. This failure led to multiple compromises in his thinking, actions, and judgement in the care of Jordyn, compromising her medical care and influencing her behavior.
>
> "Mr. Dorsch's boundary-related professional failures involved more than just his interactions with Jordyn Doty, and some of them affected her indirectly. Mr. Dorsch deviated from the requirements of his professional role in his resistance to authority and working within the hierarchies of the medical profession. These deviations reflect a

7

pattern of disdain for rules, limits, and the contribution of other professionals. They include the failure to recognize his relationship to physician colleagues within his medical center and consultants at other centers: he treated himself as their equal or superior, as reflected in his notes and in the extraordinary behavioral deviations that led to a physician's comment in a hospital discharge summary. There was polypharmacy which produced serious medical consequences, including very likely extra hospitalizations, one or more seizures, three spinal taps, medical procedures including the placement of a PICC line, dangerous weight gain, medication-induced diabetes mellitus, and the associated loss of self-image and confidence. This polypharmacy arose in distorted perception of Ms. Doty's distress. The fraught personal relationship between her and Mr. Dorsch was likely a contributing factor. Jordyn Doty's suicide attempt can be understood in this context, as acting out her despair and loss of confidence. The failure to communicate relevant information to colleagues and treating professionals, and failure to seek appropriate psychiatric and psychological consultation, were other deviations reflecting Mr. Dorsch's distorted concept of his relationship to his patient.

. . . .

"Finally, the behaviors and actions that led directly to Ms. Doty 's death involved excesses that should have been a concern, in the primary care setting, long before they led her to her death. That they were not noticed or commented on in the record reflects a deviation, suggesting that Mr. Dorsch experienced himself as a participant rather than a guiding authority in relation to Ms. Doty's social involvements and development."

Dr. Kohn concluded that the relationship between Dorsch and Jordyn had a negative influence on Jordyn's behavior. "The influence here includes a negative one, a lack of influence: the failure to address depression, and impulsive self-destructive behavior, in a patient." Moreover, he acknowledged that a "question arises around abuse of alcohol, and the judgment that led Jordyn to be in a vehicle with an intoxicated driver on the night when she died" and that these "behaviors and actions that led directly to [Jordyn's] death involved excesses that should have been a concern, in the primary care setting, long before they led to her death."

8

Dr. Kohn's report does not contain any explicit opinion that any act or omission by Dorsch, Dr. Dill, Great Plains, or RCHC deviated from any standard of care as to Jordyn's care and treatment at RCHC following the car accident on June 8, 2013. In particular, Dr. Kohn gave no opinions concerning Great Plains; in fact, Great Plains is never mentioned in his report.

The defendants' expert witness, Dr. Doug Gruenbacher, provided the following conclusions:

> "In summary, Jordyn Doty was a victim of a severe head injury [for] which she received excellent care from the health care team at Rawlins County Health Center. I see no evidence of sub-standard care and see no evidence that the care provided at Rawlins County Health Center contributed to cause Jordyn Doty's death.

> "It has been alleged that Jordyn Doty was sexually assaulted by Michael Dorsch, P.A. I did not find any evidence of sexual assault or sexual misconduct in my review."

Dana Gayle Jewell-Broughman, a physician assistant, worked with Dorsch at RCHC from 2011 through October 2013. According to her testimony, both RCHC patients and staff complained to her about Dorsch's inappropriate behavior. Jewell-Broughman asked RCHC administration to take the complaints seriously and evaluate them even though she had not personally witnessed any of the incidents for which people complained. In response, RCHC told Jewell-Broughman that if she had not personally witnessed the conduct, "If you didn't see it, it didn't happen." RCHC claims it only received one complaint regarding Dorsch during Jordyn's lifetime. This complaint involved Dorsch sitting beside Jordyn on her hospital bedside with one or both of his legs on the bed as if to lie beside her. A second complaint unrelated to Jordyn was lodged against Dorsch to RCHC after Jordyn's death. That complaint was received from a patient when Dorsch allegedly sought sexual interactions from a patient in exchange for refilling the patient's prescription medications.

9

Given the above facts, Great Plains, RCHC, and Dr. Dill all moved for summary judgment. Dorsch did not file a motion for summary judgment, and it appears that—with the exception of one letter sent to the Estate's attorney at the beginning of the litigation—he did not participate in the litigation. He also did not submit a brief to this court.

The district court ultimately granted summary judgment in favor of all defendants on all claims. The district court made four essential rulings supporting its order of summary judgment. The district court granted summary judgment on: (1) all claims arising on or before June 7, 2013, due to them being barred by the statute of limitations; (2) all claims arising after June 7, 2013, due to the lack of expert testimony as to the deviation of care by the defendants and any causation for the injuries resulting from such a deviation of care; (3) all claims relating to negligent hiring, supervision, and retention due to the lack of expert testimony establishing a causal effect between the alleged acts of negligence and the injuries allegedly sustained by Jordyn; and (4) the claims of outrage or intentional infliction of emotional distress because the Estate failed to meet the threshold requirements to bring such an action.

The Estate now timely appeals the district court's entry of summary judgment for the defendants. Great Plains cross-appeals the district court's holding that there was a genuine issue of material fact on the Estate's negligent supervision claim.

ANALYSIS

On appeal, the Estate claims the district court erred by: (1) holding all claims arising out of acts occurring on or before June 7, 2013, were time barred; (2) granting summary judgment in favor of the defendants on the Estate's medical malpractice and wrongful death claims for acts or omissions on June 8 and 9, 2013; (3) dismissing its claims of negligent hiring, supervision, and retention; (4) granting summary judgment against its claim of intentional infliction of emotional distress; (5) granting summary

10

judgment in favor of Great Plains; and (6) granting summary judgment in favor of all defendants when not all the defendants moved for summary judgment.

Great Plains cross-appeals the district court's holding that there was a genuine issue of material fact on the Estate's negligent supervision claim regarding knowledge Great Plains had or should have had about Dorsch's misconduct. According to Great Plains, its cross-appeal is intended to preserve this argument on appeal should we disagree with the district court's granting of summary judgment in favor of the defendants.

DID THE DISTRICT COURT ERR IN GRANTING SUMMARY JUDGMENT?

Our standard of review on the granting of a motion for summary judgment is well established:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

A.      *Do the statutes of limitations bar the Estate's survivorship claims?*

The Estate first argues the district court erred in granting summary judgment against its causes of action occurring before June 8 and 9, 2013. The petition is not exactly clear which precise claims the Estate brings for which alleged acts, and the district court grouped the Estate's claims as arising from acts before June 8, 2013, and those arising on or after June 8, 2013. Because the Estate's suit was filed on June 8, 2015, and given the question of the applicability of the statute of limitations, we agree with the district court's grouping of the claims by date.

The Kansas Wrongful Death Act, K.S.A. 60-1901 et seq., authorizes survivorship actions and wrongful death actions. They are separate and distinct causes of action. See *Martin v. Naik*, 297 Kan. 241, 249-50, 300 P.3d 625 (2013). A survivorship action is essentially one which seeks to compensate the decedent for damages the decedent would have recovered had the decedent survived. It allows the personal representative of the decedent's estate to recover damages accrued by the decedent between the date of injury and the date of death. See K.S.A. 60-1901(a); 297 Kan. at 249-50. To us, it appears Jordyn's estate brought a survivorship action against the defendants on Jordyn's behalf, seeking damages for personal injuries and wrongful death, medical malpractice, and intentional infliction of emotional distress she incurred between the date of injury and the date of her death.

A wrongful death action is brought by a decedent's heirs at law, allowing them to recover damages due to the wrongful death of the decedent for such things as loss of support, companionship, and mental anguish accruing after death. See K.S.A. 60-1902; 297 Kan. at 249-50. Kimberly asserted a wrongful death action as a result of Jordyn's untimely death. These claims are alleged to arise from acts occurring both before and on and after June 8, 2013, the date of the accident.

12

The following actions must be brought within two years: "[a]n action for injury to the rights of another, not arising on contract, and not herein enumerated, . . . [a]n action for wrongful death, [and a]n action arising out of the rendering of or failure to render professional services by a health care provider, not arising on contract." K.S.A. 60-513(a)(4), (5), and (7). Thus, the statute of limitations applicable to all of the Estate's survivorship negligence claims is two years. However, the question at issue on appeal is when that two-year time period began to run.

The Estate argues that the statute of limitations did not accrue on the survivorship claims until the fact of injury first became reasonably ascertainable in April 2015—when Kimberly received a call from the Kansas Board of Healing Arts informing her there had been sexual contact between Jordyn and Dorsch; therefore, any negligence actions had to be brought by April 15, 2017. To the extent resolution of this argument requires interpretation of a statute, our review is de novo. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

K.S.A. 60-513(b) provides:

"Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

Here, only K.S.A. 60-513(c) is applicable, and it reads as follows:

"A cause of action arising out of the rendering of or the failure to render professional services by a health care provider shall be deemed to have accrued at the

13

time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four years beyond the time of the act giving rise to the cause of action."

Because there are different points in time at which a cause of action could accrue under these subsections, "there are different points in time at which the statute of limitations could begin to run. It is equally clear that one of those points in time is the 'occurrence of the act giving rise to the cause of action.'" *Martin*, 297 Kan. at 247. Depending on the cause of action, a cause of action shall accrue either when "the act giving rise to the cause of action first causes substantial injury," or "at the time of the occurrence of the act giving rise to the cause of action." K.S.A. 60-513(b), (c). However, the two-year time period is extended if "the fact of injury is not *reasonably ascertainable* until sometime after the initial act." (Emphasis added.) K.S.A. 60-513(b), (c).

Once the facts establish that an action is time-barred, "the burden of proving facts sufficient to toll the limitations is upon the plaintiff." *Slayden v. Sixta*, 250 Kan. 23, 26, 825 P.2d 119 (1992). Incapacity is one condition which may serve to toll the statute of limitations. K.S.A. 60-515.

The district court determined that the date of Jordyn's attempted suicide—March 23, 2012—was the date the fact of injury to Jordyn by Dorsch was reasonably ascertainable. But even if the district court was incorrect in imputing this date, "'its decision will be upheld even though [it] relied upon the wrong ground or assigned erroneous reasons for its decision.'" See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

First, Kimberly testified that she believed Jordyn was incapacitated by overmedication from September 2011 through April or May 2012 but was not

14

incapacitated after May 2012. Thus, any survivorship claims arising during or before May 2012 were time-barred in May 2014, to the extent incapacity remained a factor. See K.S.A. 60-515. Second, any relationship between Jordyn and Dorsch admittedly waned in 2012; therefore, the Estate's claim of intentional infliction of emotional distress was barred by the end of 2014. See K.S.A. 60-513. Third, based on a review of the record on appeal, the latest possible date that Dorsch could be considered to have treated Jordyn prior to the accident was March 27, 2013. Any negligence action would have been barred on March 27, 2015—over three months before the Estate filed suit or submitted a K.S.A. 12-105b notice. See K.S.A. 60-513. Thus, all of the Estate's survivorship claims arising from acts prior to June 8, 2013, are time barred.

To avoid this result, the Estate argues there are genuine issues of fact as to when Jordyn's injuries became reasonably ascertainable:  (1) Kimberly's actual knowledge of the alleged sexual contact between Dorsch and Jordyn occurred on April 15, 2015, when the Kansas Board of Healing Arts contacted her regarding Dorsch's conduct; (2) according to Dr. Kohn, Jordyn was suffering from "transference" and, thus, was incapacitated for significant periods of time; and (3) Dorsch's continued medical care of Jordyn existed until June 8, 2013.

First, when an injury has become reasonably ascertainable for survivorship actions does *not* turn upon the knowledge of the fiduciaries of the decedent's estate. Rather, survivorship actions accrue at the same time a decedent's personal cause of action accrues. See *Martin*, 297 Kan. at 257. Even a decedent's own subjective knowledge fails to affect whether an injury is reasonably ascertainable; it is an objective injury. "[T]he legislature stated an objective standard when it provided that a cause of action accrues at the time of the occurrence of the act giving rise to the cause of action 'unless the fact of injury is not reasonably ascertainable.' Consequently, the fact a particular patient is incapacitated, which would be a subjective factor, does not affect whether the fact of

15

injury was reasonably ascertainable." 297 Kan. at 242. This objective standard applies to both K.S.A. 60-513(b) and (c). 297 Kan. at 261.

Jordyn was of the age of majority and the patient; Jordyn's knowledge is imputed to her estate, which is pursuing the survivorship causes of action as a substitute *for Jordyn*, not for Kimberly. See K.S.A. 2018 Supp. 60-1901; K.S.A. 60-1902; *Brubaker v. Cavanaugh*, 542 F. Supp. 944, 947 (D. Kan. 1982) (reaffirming that wrongful death action cannot be brought if decedent's medical malpractice action was barred at time of his or her death); *Martin*, 297 Kan. at 257; see also 22A Am. Jur. 2d, Death § 124 ("[T]he right to maintain such actions is entirely derivative of the decedent's right to have sued for his or her own injuries immediately prior to death."). Applying this standard, the statute of limitations would have begun to run as soon as the sexual contact was known *to Jordyn*. Kimberly's knowledge about any contact is irrelevant to questions regarding the statute of limitations and the Estate's survival actions.

Second, the Estate argues that transference affects whether an injury is reasonably ascertainable. Our Supreme Court has said:

> "The transference phenomenon is a psychiatric doctrine which basically states that a patient will transfer or shift her affections or hostile emotions to the patient's therapist. It was recognized in Kansas in *Seymour v. Lofgreen*, 209 Kan. 72, 75, 495 P.2d 969 (1972).

> "This phenomenon is discussed in *Simmons v. United States*, 805 F.2d 1363, 1364-66 (9th Cir. 1986), where it was recognized that failure by a therapist to recognize and deal appropriately with the phenomenon may be the basis for a malpractice action." *P.W.P. v. L.S.*, 266 Kan. 417, 426-27, 969 P.2d 896 (1998).

Standing in the way of our consideration of this issue is the fact that the Estate never raised this issue before the district court, and issues not raised below typically

cannot be raised for the first time on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011).

> "'[T]here are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. [Citation omitted.]'" *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1178 (2009).

But Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal, which the Estate did not do here, and our Supreme Court has held that Rule 6.02(a)(5) will be strictly enforced. See *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015).

While the transference theory was mentioned in Dr. Kohn's report, the Estate did not argue this theory in any of its briefs before the district court as a basis for extending the statute of limitations, nor does it assert any reason in its briefing to us why we should consider this issue for the first time on appeal. Accordingly, we must deem the issue waived or abandoned. See Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34).

Even if we could consider the Estate's transference claim, it still lacks merit. Our Supreme Court has explicitly rejected application of the transference theory as a means to toll the statute of limitations without evidence that transference prevented an injury from being ascertained. *P.W.P.*, 266 Kan. at 427. While Dr. Kohn criticized Dorsch for improperly caring for Jordyn while she was allegedly suffering from transference, he failed to indicate that transference prevented Jordyn from ascertaining her injury.

17

Also instructive is *Seymour v. Lofgreen*, 209 Kan. 72, 495 P.2d 969 (1972), *superseded on other grounds by statute as stated in Martin*, 297 Kan. 241. In that case, the plaintiff claimed her physician took advantage of her by manipulating the transference phenomenon and sexually assaulting her on many occasions. Interpreting an older version of K.S.A. 60-513, our Supreme Court determined that in addition to the tort of sexual assault having a one-year statute of limitations, any alleged negligence claim arising out of such conduct would have accrued when the relationship and alleged sexual assault ended and, therefore, was barred by the two-year statute of limitations. 209 Kan. at 76. Our Supreme Court held the injuries alleged—being sexually assaulted during a period of incapacitation—"were by their nature acute and easily ascertainable. The allegations in the petition merely show that the plaintiff was unable to ascertain them because of mental illness." 209 Kan. at 79. Such a holding is consistent with that of other jurisdictions. See *State ex rel. Marianist Province of U.S. v. Ross*, 258 S.W.3d 809, 811 (Mo. 2008) (holding that even though plaintiff did not remember sexual details of abuse, conduct he always remembered was sufficient to "'place a reasonably prudent person on notice of a potentially actionable injury'"); *Haggart v. Cho*, 703 A.2d 522, 526 (Pa. Super. Ct. 1997) (holding patient had salient facts to be on duty of inquiry at time of sexual misconduct during course of treatment, not when she later found out about transference phenomenon). Here, the district court found any relationship between Dorsch and Jordyn ended in 2012; thus, the statute of limitations would have run in 2014, well before the Estate filed its petition.

Finally, regarding the Estate's third attempt to avoid the statute of limitations, the continuing interaction between a medical provider and a patient does not toll the statute of limitations. See *P.W.P.*, 266 Kan. at 429. Therefore, the fact that Dorsch may have treated Jordyn periodically up until the date of her death does not affect the statute of limitations.

The Estate provides us three cases which purportedly support its argument: *Jones v. Neuroscience Assocs., Inc.*, 250 Kan. 477, 827 P.2d 51 (1992), *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971), and *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985). We are unpersuaded by them because in each case there were facts to justify the delay in filing suit. See *Jones*, 250 Kan. at 478-79; *Hecht*, 208 Kan. at 85-92; *Cleveland*, 237 Kan. at 412-13.

The Estate also cites *Hall v. Miller*, 29 Kan. App. 2d 1066, 36 P.3d 328 (2001), but this decision, again, is not instructive. There, Hall alleged that her psychologist/social worker and physician implanted false memories of satanic ritual abuse. A panel of our court reversed the district court's granting of summary judgment in favor of the defendants and held that a genuine issue of material fact existed regarding at what point Hall knew or could have reasonably ascertained that she had suffered substantial injury caused by the alleged negligence of the defendants. 29 Kan. App. 2d at 1074. The panel found it significant that the defendants had

> "successfully convinced Hall that she was a survivor of abuse suffered at the hands of her parents and friends, effectively eliminating her outside support system. Also, unlike *Seymour*, as soon as Hall discovered through evaluation by independent clinicians that [the psychologist] had caused her illness, not merely misdiagnosed it, she filed suit." 29 Kan. App. 2d at 1072.

The case before us clearly does not involve memory implantation, and there are no allegations that Dorsch cut off Jordyn from her family support system. Further, there is no evidence about Jordyn's awareness—or lack of awareness—that would justify the tolling of the statute of limitations. The district court's decision to grant summary judgment for all survivorship claims arising from acts or omissions prior to June 8, 2013, was not error.

19

In order for a survivorship claim to be viable, the decedent must have had a viable cause of action, assuming the decedent lived. See K.S.A. 2018 Supp. 60-1901. "[I]n construing our wrongful death statute, . . . where the injured party could not have brought an action for his personal injuries because the statute of limitations had run against his claim prior to his death, a wrongful death action cannot be maintained." *Mason v. Gerin Corp.*, 231 Kan. 718, 725, 647 P.2d 1340 (1982). Jordyn could not have maintained an action for any acts or omissions before June 8, 2013. Because Jordyn was time-barred from bringing such an action at the time of her death, the Estate cannot now do so. Therefore, we affirm the district court's grant of summary judgment for all survivorship claims arising from acts or omissions prior to June 8, 2013.

B.       *Did the district court properly grant summary judgment on the Estate's medical malpractice and wrongful death claims?*

1.       *Claims arising from acts of omissions on June 8 and 9, 2013*

The Estate also argues the district court improperly granted summary judgment on the Estate's medical malpractice and wrongful death claims for acts or omissions on June 8 and 9, 2013. These arguments are intertwined because, as we will discuss, the success of a wrongful death claim relies on the success of an underlying action.

K.S.A. 2018 Supp. 60-1901(a) requires:

> "If the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom if the former might have maintained the action had such person lived, in accordance with the provisions of this article, against the wrongdoer, or such wrongdoer's personal representative if such wrongdoer is deceased."

"Under K.S.A. 60-1901, an action for wrongful death must be premised upon an underlying cause of action the decedent would have been able to bring if he or she had survived. Therefore, a variety of theories may support a wrongful death action." *Bonura v. Sifers*, 39 Kan. App. 2d 617, Syl. ¶ 3, 181 P.3d 1277, *rev. denied* 286 Kan. 1176 (2008). Here, the Estate seems to premise its wrongful death claim on a claim of medical malpractice.

In Kansas, a claim of medical malpractice requires the plaintiff to show:

"(1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. [Citation omitted.]" *Foster v. Klaumann*, 296 Kan. 295, 302, 294 P.3d 223 (2013).

The Estate argues that it satisfied the last element of this test. But this argument fails to recognize that the district court granted summary judgment on the medical malpractice claim for acts or omissions on June 8 and 9, 2013. While Dr. Kohn's report made numerous conclusions about the breach of standard of care for events occurring in 2011 and 2012, there were no conclusions that any standard of care was breached on the night of the accident and the day of Jordyn's death. And as previously discussed, any acts or omissions supporting a cause of action prior to the accident are time barred. Because the Estate has failed to brief this first ground for the granting of summary judgment on this issue, we deem the issue abandoned. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). The district court properly granted summary judgment on the Estate's claim of medical malpractice and wrongful death on June 8 and 9, 2013.

## 2. *Claims arising from acts or omissions before June 8, 2013*

Before we turn to the Estate's remaining claims, we must address a claim that falls outside of our analysis discussed above:  Kimberly's wrongful death claim concerning acts or omissions occurring prior to June 8, 2013. As we have already explained, that particular claim differs from the Estate's survivorship claims because it is a claim which seeks damages for the impact of Jordyn's death on Kimberly. Kimberly's specific claim alleges that Dorsch's abuse and medical malpractice of Jordyn led Jordyn to make bad decisions which in turn caused or contributed to her death. Because this claim is a wrongful death claim made by Kimberly and is not a survivorship claim being made by Jordyn's estate, this claim, unlike like the other claims arising out of acts or omissions occurring before June 8, 2013, is not barred by the statute of limitations as the two-year statute of limitation for wrongful death claims begins to run on the date of the decedent's death. See *Martin*, 297 Kan. at 256 (limitation period for wrongful death action begins on date of decedent's death).

Nevertheless, the district court properly granted summary judgment on Kimberly's medical malpractice and wrongful death claims because even if we assume that the Estate's expert properly established a breach of the standard of care, the Estate failed to establish the causation element. In both civil and criminal contexts, causation requires "that one thing [be] the proximate cause of another. To establish that one thing proximately caused another, a party must prove two elements: cause-in-fact and legal causation. Together, these elements limit a defendant's liability to '"those consequences that are probable according to ordinary and usual experience."' *Puckett*, 290 Kan. at 420." *State v. Arnett*, 307 Kan. 648, 654, 413 P.3d 787 (2018).

In a nutshell, cause-in-fact is premised on cause and effect; legal causation is premised on foreseeability. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420-21, 228 P.3d 1048 (2010). Here, the fourth element of medical malpractice—the

22

injury proximately resulted from the health care provider's breach of the standard of care—is the element founded on proximate causation.

Ordinarily, proximate cause "is . . . a factual question to be resolved by the trier of fact." *Burnette v. Eubanks*, 308 Kan. 838, 846, 425 P.3d 343 (2018); *Cullip v. Domann*, 266 Kan. 550, Syl. ¶ 6, 972 P.2d 776 (1999). However, "when all the evidence on which a party relies is undisputed and susceptible of only one inference, the question of proximate cause becomes a question of law." *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008).

a.       *Cause-in-Fact*

To prove cause-in-fact, "a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury could conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Puckett*, 290 Kan. at 420. The Supreme Court has explained the evidence necessary to meet this standard as follows:

> "'The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. . . .

> "'The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no one can

say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than "the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions." If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.'" *Baker v. City of Garden City*, 240 Kan. 554, 559, 731 P.2d 278 (1987) (quoting Prosser and Keeton on Torts § 41, pp. 269-70 [5th ed. 1984]).

"The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury." *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." 243 Kan. at 307. This expert testimony should be confined to matters which are certain or probable, rather than merely possible. See *Sharples v. Roberts*, 249 Kan. 286, 292, 816 P.2d 390 (1991).

The district court found that there was no evidence or expert testimony directly linking any of the alleged acts of negligence in Dr. Kohn's report to Jordyn's death. The Estate completely ignores this element of proximate cause, and it does not cite to any authority to show the alleged negligence not only "influenced" Jordyn's decision-making, but also was the cause-in-fact of Jordyn's death, without which her death would not have occurred. The only evidence on the cause of death is the autopsy report with which Dr. Kohn agrees and admits in his report:  Jordyn died from fatal injuries in a car crash.

Nowhere in Dr. Kohn's expert report does he address the issue of causation of death or state any opinions to a reasonable degree of medical probability that any defendant in this case was the cause-in-fact of Jordyn's death. While Dr. Kohn uses boilerplate language at the very end of his report that "[a]ll the opinions in this report are held to a reasonable degree of medical (neurological, psychiatric, neuropsychiatric) certainty," there are no opinions on causation of death. All of Dr. Kohn's opinions are instead directed only to proving causation for injury suffered by Jordyn during her lifetime (striking to the heart of the survivorship claims), which are barred by the statute of limitations, as previously discussed.

No defendant was involved in any way with the accident. Hafer was the driver and pled guilty to vehicular homicide for Jordyn's death. Likewise, there was no evidence of any substandard care following the accident whatsoever that may have contributed to Jordyn's death. Thus, tacitly, there was no evidence or opinions attempting to link any substandard care following the accident to the cause of death. It is undisputed that Jordyn suffered fatal injuries from the motor vehicle accident on June 8, 2013, and those injuries caused her death.

Therefore, the only possible causal link for Jordyn's death would be if there was a claim that the defendants were negligent in failing to protect Jordyn by preventing her from getting into the car with another intoxicated person and requiring her to buckle her seatbelt. The Estate fails to demonstrate this causal link.

There was no evidence that Dorsch's alleged failure to maintain appropriate boundaries and implement appropriate interventions was a substantial factor in bringing about the harm that Jordyn would make poor decisions to drink and then ride in a vehicle driven by her legally intoxicated fiancé over a year after her last documented contact with Dorsch. Where the evidence is undisputed and shows another source to be the cause of the claimed damage in the case—for example, Jordyn's car accident—then summary

25

judgment for lack of proof concerning causation is appropriate. See *Cullip*, 266 Kan. at 556 (holding defendant's violation of statute requiring hunter safety certificate was not proximate cause of plaintiff's injury when undisputed facts show plaintiff was shot by accidental discharge of shotgun carried by another member of hunting party).

Thus, the district court correctly dismissed the Estate's medical malpractice and wrongful death claims based on acts or omissions both before and after June 8, 2013, because there was no evidence of cause-in-fact.

b. *Legal Causation*

"To prove legal causation, the plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable. The concept of 'intervening cause' relates to legal causation and 'does not come into play until after causation in fact has been established.' *Waste Management*, 15 S.W.3d at 432; see also Prosser and Keeton, The Law of Torts § 44, p. 301 (5th ed. 1984) (recognizing the issue of intervening cause 'does not arise until cause in fact is established').

"An intervening cause is 'one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.' Restatement (Second) of Torts 441 (1964). An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence. In other words, the superseding and intervening cause 'component breaks the connection between the initial negligent act and the harm caused.' *Hale*, 287 Kan. at 324. But, one more factor—foreseeability—must be considered. 'If the intervening cause is foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. [Citation omitted.]' *Miller v. Zep Mfg. Co.*, 249 Kan. 34, 51, 815 P.2d 506 (1991)." *Puckett*, 290 Kan. at 421.

If the chain of events leading from a defendant's negligent act to a plaintiff's harm is so remote as to appear "extraordinary" that the conduct could have brought about the

harm, then the act did not proximately cause the harm as a matter of law. See 290 Kan. at 423. Additionally, there is no obligation under Kansas law to anticipate another's negligence. *Mid-Century Ins. Co. v. Latimer*, 211 Kan. 810, 812, 508 P.2d 935 (1973).

"An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or the failure to act will likely result in harm." *Gragg v. Wichita State Univ.*, 261 Kan. 1037, Syl. ¶ 8, 934 P.2d 121 (1997). The acts of a third person not intended or foreseen break the causal chain between prior negligence and injury. *Sly v. Board of Education*, 213 Kan. 415, Syl. ¶ 9, 516 P.2d 895 (1973).

Here, there is no evidence that Dorsch or any of the other defendants should have realized that there was a likelihood that Jordyn would be killed in a drunk driving accident at the hands of her fiancé over a year after she was last seen by Dorsch. The lack of proximity to the time of these events or relationally to the natural effects of the treatment are simply too remote and disconnected from any of the events of the drunk driving accident which was in no way related to the care and treatment provided to Jordyn in 2011 or 2012. Further, Dr. Kohn fails to fill this gap with any explanation for how the treatment could be causally related to the accident or Jordyn's death.

The causation of Jordyn's death was the independent and intervening actions of Hafer engaging in conduct that resulted in his vehicular homicide conviction, which even Dr. Kohn agrees led directly to Jordyn's death and, without which, she would not have died on June 9, 2013. Even if defendants negatively influenced a condition in which Jordyn continued to engage in risk-taking behavior, that behavior did not kill her—Hafer's intervening negligence in operating his motor vehicle while impaired caused her death.

27

The Estate fails to show any facts to establish proximate cause, and the facts alleged clearly show there was not proximate cause for Jordyn's death on behalf of the defendants. The district court did not err in granting summary judgment for the defendants on the medical malpractice and wrongful death claims.

C.    *Did the district court properly dismiss the claims of negligent hiring, supervising, and retention?*

Next, the Estate argues the district court improperly dismissed its claim of negligent hiring, supervision, and retention. The district court held that summary judgment was proper on this claim because the statute of limitations barred the survivorship claims and the remaining portions of the medical malpractice and wrongful death claims lacked the essential element of establishing a breach of the standard of care and causation.

The Estate's claims of negligent hiring, supervision, and retention really constitute two separate and distinct torts. Kansas has long recognized the tort of negligent hiring and retention, wherein an employer may be held liable for injuries to a third party resulting from an employee's unfitness or incompetence of which the employer knew or should have known. *Prugue v. Monley*, 29 Kan. App. 2d 635, 639, 28 P.3d 1046 (2001). The separate and distinct tort of negligent supervision is also recognized in Kansas and encompasses an employer's failure to supervise the employee. *Hauptman v. WMC, Inc.*, 43 Kan. App. 2d 276, 294, 224 P.3d 1175 (2010). But these torts are separate negligence claims from those of the alleged negligence of the employee, and thus the underlying negligence of the employee must be established along with the negligence of the employer. See *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 329, 961 P.2d 1213 (1998); 25 Causes of Action 2d 99 § 3 (July 2019) (in cause of action for negligent hiring, supervision, or retention of employee, plaintiff must establish injurious act of

28

employee was tort). Thus, for the Estate to prevail on this issue, it first must have a valid negligence claim against Dorsch.

The parties get sidetracked and spend most of their arguments focusing on whether expert testimony is required under the facts of this case to establish the Estate's negligent hiring, supervision, and retention claims because, according to the Estate, they "are not medical negligence claims." Whether expert testimony is necessary to establish the applicable standard of care does not depend upon the classification of a claim as ordinary negligence rather than medical malpractice or another cause of action. *Tudor v. Wheatland Nursing*, 42 Kan. App. 2d 624, 628, 214 P.3d 1217 (2009), *rev. denied* 290 Kan. 1105 (2010). Rather, "the well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is 'beyond the capability of a lay person to decide.'" *Williamson v. Amrani*, 283 Kan. 227, 245, 152 P.3d 60 (2007), *superseded by statute on other grounds as stated in Kelly v. VinZant*, 287 Kan. 509, 197 P.3d 803 (2008).

The Estate's negligent hiring, supervision, and retention claims involving acts or omissions that occurred prior to June 8, 2013, cannot succeed because the underlying negligence claims against Dorsch for those acts are either time barred or are lacking essential elements. As to the claims involving acts or omissions occurring on June 8 and 9, 2013, the Estate's allegations of negligence against Dorsch arise under medical malpractice. Because the Estate presented no evidence establishing a standard of care, a breach of that standard, or causation, the Estate cannot succeed in its negligent hiring, supervision, and retention claims based upon these acts. Accordingly, the district court did not err in granting the defendants summary judgment.

D. *Did the district court err in granting summary judgment for the claim of intentional infliction of emotional distress?*

Next, the Estate argues that the district court erred in granting summary judgment on its claim of outrage or intentional infliction of emotional distress. Specifically, the Estate argues the district court erred in dismissing this claim because no proof of actual sexual contact was required to support the claim and discovery had not yet been completed.

"In Kansas, the tort of outrage is the same as the tort of intentional infliction of emotional distress." *Valadez v. Emmis Communications*, 290 Kan. 472, 476, 229 P.3d 389 (2010). A claim of intentional infliction of emotional distress requires proof "(1) [t]he conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe." 290 Kan. at 476.

Important to the district court's holding:

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it. [Citation omitted.]" 290 Kan. at 477.

The district court granted summary judgment on this issue as follows:

"The Defendants['] uncontroverted facts state that Plaintiffs do not have any personal knowledge of any sexual conduct between Mr. Dorsch and Jordyn Doty.

30

Further, the Defendant[s'] uncontroverted facts state that the Plaintiffs have no admissible evidence to show that any sexual conduct occurred on June 8 or 9, 2013, between Mr. Dorsch and Jordyn Doty. . . . [N]either of the documents [submitted by Plaintiffs] provides any evidence as to Mr. Dorsch engaging in sexual conduct with Jordyn Doty during any of the time he treated her. Therefore, the Court finds that the Plaintiff cannot meet the two threshold requirements set forth in *Valadez*."

The Estate first argues that no proof of actual sexual contact was required to sustain this claim. In a vacuum, the Estate is correct:  Sexual conduct is not necessary to prove a claim of intentional infliction of emotional distress. However, under the facts and allegations of this case, there is nothing else that could carry the heavy burden of sustaining such a cause of action, and that is simply how the Estate pled this claim before the district court. In its first amended petition, the Estate premised its entire claim of intentional infliction of emotional distress on Dorsch's alleged sexual assault of Doty: "Defendant Dorsch's sexual assault of Miss Doty is extreme and outrageous conduct [and Dorsch] intended to cause Jordyn Doty severe emotional distress, or acted with reckless disregard of the probability of causing emotional distress." There are no other assertions directly relating to this cause of action. Because of how the Estate pled the cause of action, evidence of sexual assault was required. Kimberly conceded that she had no personal knowledge or evidence of any sexual assault of Jordyn by Dorsch at any time during Jordyn's lifetime or on the night of the fatal accident, nor is Jordyn's knowledge of any assault available.

Further, even though the Estate complains on appeal that conduct other than sexual conduct *can* serve as a basis for intentional infliction of emotional distress, it makes no proffer of evidence—before us or below—that would possibly serve as the basis for such a claim. See *Dawson v. Prager*, 276 Kan. 373, 388-89, 76 P.3d 1036 (2003) (holding that claims defendant "'failed to keep appropriate boundaries, failed to protect plaintiff from her own self-destructiveness, abruptly abandoned her relationship

31

with Plaintiff and was negligent in handling the therapeutic process'" were insufficient to state claim for intentional infliction of emotional distress).

Additionally, sexual assault has a one-year statute of limitation. K.S.A. 60-514. Plaintiffs are not permitted to couch their claims in different terms in order to evade a statute of limitations. See *Martinmaas v. Engelmann*, 612 N.W.2d 600, 614 (S.D. 2000) (Konenkamp, J., concurring); see also *Dawson*, 276 Kan. at 388. But that is precisely what the Estate is attempting to do here. Although the district court did not dismiss the Estate's intentional infliction of emotion distress claim on statute of limitations grounds, we find it would have been proper to do so. See *Gannon*, 302 Kan. at 744 (holding district court's correct result will be upheld even if it "'relied upon wrong ground or assigned erroneous reasons for decision.'").

Finally, the Estate argues that the district court erred in granting summary judgment on its claim for intentional infliction of emotional distress because no party moved for summary judgment on the issue. However,

> "a trial court has inherent power to dispose summarily of litigation where no genuine
> issue exists as to any material fact and where, giving effect to every reasonable inference
> which can be drawn from the evidence, judgment must be for one party or the other, as a
> matter of law. Such authority may be exercised by a trial court even though no motion
> has been filed or prior notice given, provided neither party is placed at a disadvantage
> because thereof." *Collins v. Meeker*, 198 Kan. 390, 393, 424 P.2d 488 (1967).

The Estate has not shown that it lacked notice or was prejudiced because of a lack of notice. If the Estate had needed more time to conduct discovery on the issue of sexual assault, it should have moved for additional time supported by an affidavit for those reasons pursuant to K.S.A. 2018 Supp. 60-256(f). Instead, in its response to the motion to stay discovery, the Estate focused on the relationship between RCHC and Great Plains.

32

The Estate cannot now complain that additional time was needed to explore Dorsch's conduct on June 8, 2013, when it appears not to have done so below.

E.      *Did the district court err in granting summary judgment when there were alleged disputed facts?*

Fifth, the Estate argues that the district court erred in granting summary judgment in favor of Great Plains on the issue of vicarious liability given the presence of disputed facts concerning Great Plains' control over RCHC, Dorsch, and Dr. Dill.

The district court held:

> "The facts of this case indicate that [Great Plains] was an independent contractor, who provided administrative services to RCHC. However, the facts do not establish that this relationship created an employer and employee relationship or principal and agent relationship between [Great Plains] and RCHC or its employees. The facts establish that Dr. Dill and Mr. Dorsch were employees of the RCHC. Therefore, the Court finds that the Plaintiffs cannot establish the necessary relationship between [Great Plains] and the other Defendants to impute any negligence of RCHC, Dr. Dill, and Mr. Dorsch to [Great Plains]. Thus, the Defendant [Great Plains] is entitled to summary judgment on this issue."

We quote the Estate's argument before us in its entirety:

> "First, the district court was presented with evidence that Defendant [Great Plains] was to some extent responsible for hiring, supervising and retaining Defendant Dorsch. Furthermore, as set forth above, the district court stayed discovery upon the filing of Defendants' Motions for Summary Judgment and Joint Motion to Stay Discovery. *See supra*. Accordingly, the district court erred in precluding the Plaintiffs from completing discovery on the very issues before the court and then granting summary judgment for failure to provide sufficient evidence."

33

The evidence that the Estate references as a material dispute of fact regarding Great Plains' responsibility for the other defendants was ruled as inadmissible hearsay by the district court. The Estate fails to be candid with us about that fact and does not challenge the district court's hearsay ruling below. Because the Estate does not challenge the district court's exclusion of evidence, we find the Estate has failed to properly raise and brief this issue; therefore, the issue has been waived or abandoned. See *In re Marriage of Williams*, 307 Kan. at 977. As such, there was no error in the granting of summary judgment on this cause of action.

F.      *Did the district court err in granting summary judgment in favor of all defendants when not all defendants moved for summary judgment?*

Last, the Estate argues that the district court erred in granting summary judgment in favor of all defendants on all claims when not all defendants moved for summary judgment and not all claims were addressed in the defendants' motions for summary judgment or the ruling of the district court.

While at first blush this argument appears to have merit, a careful examination of the Estate's argument in its brief leaves us unpersuaded. As we have already explained, the granting of summary judgment without motion is an inherent power of the district court. See *Collins*, 198 Kan. at 393. Additionally, the Estate's assertion of error on this point strikes us as a "catch-all" allegation in which the Estate fails to pinpoint any particular error or claim other than making a passing reference to an alleged wrongful disclosure. No such claim was ever pled or made below. The district court did not err in granting summary judgment in favor of all defendants and dismissing the case.

Because all of the Estate's claims on appeal are without merit and because the district court properly granted summary judgment on all claims for all defendants, Great Plains' cross-appeal is moot.

34

Affirmed.